## APRIL TERM, 1890.

### BOETTCHER v. COLORADO NAT. BANK.

1. LIABILITY OF BANKS TO PAY CHECKS DRAWN AGAINST GENERAL DEPOSITS.— In a suit against a bank for the amount of certain checks drawn by a firm of millers in plaintiff's favor, and which, although there were moneys to the drawer's credit, were refused payment because the bank retained such moneys for the discharge of a debt about to fall due to itself, an allegation that such moneys were the proceeds of wheat sold to the drawers by plaintiff, and were deposited for the payment of such checks, and for no other purpose, was not sufficient to charge the bank as a trustee, in the absence of an averment that it was a party to the agreement or had notice thereof.

2. SUBSEQUENT RIGHTS OF PERSONS TO FUNDS DEPOSITED CONTROLLED BY THE CHARACTER OF THE DEPOSIT OR CIRCUMSTANCES AFFECTING THE CONTRACT.— The simple deposit of money in a bank on account is a general deposit, and transfers the ownership of the money to the bank. To constitute a deposit a trust fund either an express agreement is necessary or circumstances giving the transaction the character of a special deposit. Without privity of contract, acceptance or circumstances indicating an intent on the part of the drawee to accept a check drawn by a general depositor, the payee cannot maintain thereon an action in his own name against the drawee.

3. AN AMENDMENT TO THE COMPLAINT, MADE AFTER REVERSAL ON FORMER APPEAL, PROPERLY QUASHED FOR FAILURE TO STATE A CAUSE OF ACTION.— Where an amendment, made four years after a reversal, was ordered stricken from the complaint on the ground that it added a new and distinct cause of action, the reviewing court, without determining whether the ground stated was sufficient, will not reverse the order, when it appears that the amendment did not state facts sufficient to constitute a cause of action.

*Appeal from District Court of Arapahoe County.*

Messrs. WELLS, McNEAL & TAYLOR, for appellant.

Mr. J. Q. CHARLES, for appellee.

REED, C. On the 28th day of January, 1878, Shackleton & Brinker were partners engaged in business, and keeping

a general account with the appellee, and on that date drew their check payable to. appellant five days after date, for $472.49; on January 31st, a second check for $453.25, payable six days after date, and one for $37.62 payable on presentation. The first check matured February 2d, the second check February 5th, the third, due at sight, was presented February 2d. The checks were deposited by appellant for collection with the Union Bank of Greeley, and were forwarded by that bank to appellee. On the 2d day of February there was with appellee, to the credit of Shackleton & Brinker, $371.64, and a further deposit was made of $473. On the 5th of February another deposit of $214.84 was made, making the amount to their credit on that date (after deducting an item of interest due the bank) $1,058.39. On January 31st Mr. Shackleton died, leaving Mr. Brinker surviving partner. The three checks were received by appellee from the Union Bank, the first on January 30th, the second on February 1st, the third on February 2d. On February 2d, when the check of January 28th was due, and the sight check was presented, there was not sufficient money to pay both, and neither was paid, but the checks were retained by the appellee. On the 5th of February, when the other time check became due, there was not sufficient money to pay the three, and none were paid. The checks were returned to the Union Bank, and the bank notified of the death of Mr. Shackleton, but with no statement of want of money to meet them. It had also been ascertained by appellee that the firm of Shackleton & Brinker was insolvent, but this fact was not communicated to the Union Bank at the time of the return of the checks. At the time of the presentation of the checks appellee held a note of Shackleton & Brinker for $1,200 and interest, that matured on February 7th, and on that date the money of Shackleton & Brinker ($1,058.39), standing to their credit in the bank, was applied by the appellee upon the note. On the same day appellant and his attorney presented the checks to appellee and demanded payment, which was re-

fused; and on the next day, February 8th, Mr. Brinker, by a written instrument, assigned to appellant all the moneys of Shackleton & Brinker in appellee bank. The assignment was presented to appellee, payment of the money demanded and refused, and suit was afterwards instituted upon the checks by appellant, resulting in a judgment in his favor. An appeal was taken to this court, and the judgment reversed. See *Bank v. Boettcher*, 5 Colo. 185, where this court held —*First*, that "the holder or payee of the check cannot in his own name maintain an action against the drawee, unless the check had been accepted;" *second*, that "to warrant the inference of acceptance from conduct, * * * that the circumstances must clearly indicate such an intention on the part of the drawee;" *third*, that "mere detention does not constitute an implied acceptance, and a conditional acceptance is not enforceable until complete fulfillment of the condition." The opinion of the court closes as follows: "We are of opinion that the judgment cannot be sustained on the ground of an implied promise, on the present testimony, either upon the authority cited or upon principle. As further testimony affecting the conduct of the appellee may be produced upon another trial, the judgment will be reversed and the cause remanded."

Three or four years afterwards the complaint was amended by adding to each of the original statements of the cause of action the words, "that the said defendant, with intent to accept said checks and pay the same out of the moneys so deposited, detained said checks until February 5, A. D. 1878;" and a fifth and additional count or statement of the cause of action was added, in which, after stating the facts of the case as above, it is alleged, in effect, that Shackleton & Brinker were millers, and purchased large quantities of wheat from appellant to be made into flour, the wheat to be paid for from the proceeds of the flour, and that they made the checks against such proceeds; that appellee at first, intending to pay the checks, kept them until February 5th; that appellee owned and held a certain promissory

note of Shackleton & Brinker, which was about to mature; that Shackleton & Brinker, and also Brinker, were insolvent, which fact was known to appellee, and that it also knew appellant was not informed of the fact; that appellee, with the intention of applying the money in its possession to the payment of the note and defraud the plaintiff, detained the checks until February 5th, and then returned them with directions to correspond with Shackleton & Brinker, without giving any information in regard to the insolvency of the firm or the existence of the promissory note; that the moneys held by appellee were the proceeds of the wheat sold by appellant to Shackleton & Brinker, and were deposited for the payment of the checks, and for no other purpose; that all the moneys, by reason of the premises, were in equity appropriated to the payment of the checks, and were held by the bank in trust for that purpose; praying judgment for the sum of $1,363.36, with interest, "or, if it shall appear the said checks are not accepted, that an account be taken of the moneys in the hands of the defendant liable for the payment of the sum, and for a decree that plaintiff is entitled in equity to have the moneys, to the amount of the checks, to be applied to the payment thereof."

The appellee moved the court to strike out the new statement or count; which motion was sustained, and the clause stricken out. The answer to the remaining complaint was full and complete. Trial was had to a jury upon the issues under the pleadings, the facts established, in the judgment of the court, being substantially the same as upon the former trial. At the close of the testimony the court, in accordance with the opinion of this court, ordered a verdict for the defendant (appellee). So far as the questions presented on this appeal were involved in and determined upon the former appeal, that case must be considered as conclusive of this. The questions had not previously been settled judicially in this state; the decisions in other courts were

conflicting; the questions were carefully considered; the conclusions reached were based upon the decisions of the federal courts and those of several important commercial states. Where the decisions, especially upon the law of commercial paper, are conflicting, it may be considered safe to adopt the conclusions of the federal courts; and it is far better that this branch of the law should be settled definitely than that it be allowed to remain in a fluctuating and uncertain condition.

It will be observed by the language used in the concluding paragraph of the opinion that the cause was remanded to allow further testimony to be introduced in regard to the conduct of appellee in the premises. After an unreasonable delay of three or four years, unexplained, counsel applied for leave to amend the complaint, which appears to have been granted, though upon what grounds we are not advised. The granting of leave to amend pleadings being, however, under our practice, so greatly in the discretion of the court, it will be presumed the discretion was properly exercised. The additions made to the original statements of the supposed cause of action may be considered as legitimate amendments.

But the question presented for determination in this case is, Did the court err in striking out the fifth count or statement which purported to be entirely new? It is contended in argument that the matter set up in the new count was a new, separate and distinct cause of action; that it could not be added to or substituted for the other cause of action, at this stage of the proceeding, under our system of practice. The original cause of action was purely legal. An attempt was made in this count to procure purely equitable relief; but whether it was a proper amendment we do not think it necessary to now determine. True, the motion to strike was based upon the fact that it was not an amendment, but a new and different cause of action; but the action of the court was not necessarily confined to the cause assigned in

the motion. If it was insufficient, did not contain facts sufficient to constitute a cause of action, was lacking in essential allegations, the court was warranted in disregarding it. In it the chancery powers of the court were invoked, and it was asked to find and declare the bank to be a trustee, to administer a specific trust for the benefit of the appellant. The equitable case attempted to be made by this count falls far short for want of the material allegations necessary to constitute the appellee a trustee. Admitting the course of business between appellant and Shackleton & Brinker to have been as stated, and appellant by the course of trade or by an agreement equitably entitled to the proceeds of the wheat for its payment, such fact could not affect appellee unless it was a party to such contract, or at least had knowledge of it. Appellee could only be made liable in equity, as trustee, by the allegation and proof of a contract creating a trust to which it was a party, or which, after due notice of its trusteeship, it failed to repudiate. 3 Pom. Eq. Jur. §§ 1237, 1284; *Harrison v. Wright*, 100 Ind. 524; *Hopkinson v. Forster*, L. R. 19 Eq. 74; *Creveling v. Bank*, 46 N. J. Law, 255; *Chapman v. White*, 6 N. Y. 417; *Rosenthal v. Bank*, 17 Blatchf. 318.

The paragraph stricken out contained no allegation that appellee was a party to any such contract, or even knew of such a course of business, or the arrangement or equities alleged to have existed between appellant and Shackleton & Brinker, or knew that the money deposited by Shackleton & Brinker was the proceeds of flour made from the wheat furnished by appellant. The deposit by Shackleton & Brinker was a general deposit to their credit. To constitute it a trust fund for the purpose indicated, it should, either by express agreement or by circumstances indicative of the intent to make it such, have been given the character of a special deposit. "The simple deposit of money on account is a general deposit, and transfers the ownership of the money to the bank. The ordinary relation existing be-

tween a bank and its customer, if not complicated by any further transaction than that of the depositing and withdrawing moneys by the customer from time to time, is simply that of debtor and creditor, at common law.  *  *  *  So soon as the money has been handed over to the bank, and the credit given to the payer, it is at once the proper money of the bank; it enters into the general fund and capital, and is undistinguishable therefrom.  Thereafter the depositor has only a debt owing him from the bank,— a chose in action,— not any specific money, or a right to any specific money." 2 Morse, Bank, § 568; *Marine Bank v. Fulton Bank*, 2 Wall. 252; *Thompson v. Riggs*, 5 Wall. 663; *Bank v. Millard*, 10 Wall. 152; *Ætna Nat. Bank v. Fourth Nat. Bank*, 46 N. Y. 82; *Carr v. Bank*, 107 Mass. 45; *Dana v. Bank*, 95 Mass. 445." A deposit is not special unless made so by agreement or directions of the depositor, or by such circumstances as being inclosed in a box, or other matter indicative of intent not to make a general deposit, or unless made in a particular capacity which indicates such intent." 2 Morse, Bank, § 568*b*; *Brahm v. Adkins*, 77 Ill. 263; *Neely v. Rood*, 54 Mich. 134.  It is the more common practice to challenge such defects by demurrer; but legislative authority to do so by motion is not wanting.  Sec. 60, Civil Code.  And, under all the circumstances of this case, we do not feel justified in disturbing the action of the court below.

It has already been found by this court that the detention of the checks by appellee did not of itself amount to an acceptance.  It has frequently been held, both in England and the United States, that, without an acceptance or specific promise to pay, there was no privity between the payee and the bank so that the former could maintain a suit against the latter, and the rule is the same in equity as at law.  *Foley v. Hill*, 2 H. L. Cas. 28; *Creveling v. Bank, supra; Bank v. Millard, supra; Attorney-General v. Insurance Co.* 71 N. Y. 325; *Christmas v. Russell*, 14 Wall. 84;

*Lunt v. Bank*, 49 Barb. 227; *Loyd v. McCaffrey*, 46 Pa. St. 410; *Ætna Nat. Bank v. Fourth Nat. Bank, supra.* We advise that the judgment of the district court be affirmed.

Richmond, C., concurs.

Per Curiam.  For the reasons stated in the foregoing opinion the judgment of the district court is affirmed.

Elliott, J. (*dissenting*).  Upon the second trial of this cause at *nisi prius* I endeavored to follow the opinion of this court reversing the first judgment, as reported in 5 Colo. 185.  It is a familiar rule that on this appeal such former opinion is to be regarded as the law governing the case, so far as the matters involved in the litigation remain unchanged.  *Lee v. Stahl*, 13 Colo. 174.  If on this appeal the court had affirmed the last judgment of the district court simply upon the ground of following " the law of the case," I should have refrained altogether from participating in the decision; but I feel constrained to dissent from a general re-affirmance of the doctrine announced (*Bank v. Boettcher*, 5 Colo. *supra*), because the same appears to be manifestly at variance with the decision of this court in *Lehow v. Simonton*, 3 Colo. 346, and contrary to sound principles and the better authorities relating to the obligation of banks to pay the checks of their depositors.  The opinion in *Lehow v. Simonton* declares, in effect, that, where two parties enter into a simple contract for the benefit of a third, the third party, though a stranger to the consideration, may maintain an action for a breach of such contract, notwithstanding there may be a want of privity between himself and the promisor.  As the arrangement between a bank and its depositor is a matter of simple contract, the *Lehow-Simonton Case* would seem to be a complete answer to the objection that there is a want of privity between the check-holder and the bank, as stated in *Bank v. Millard*, 10 Wall. 152.  But I must not be understood as conceding that there is a want of privity between the bank and *bona*

*fide* check-holders upon presentation of their checks for payment in the usual course of business. According to the system of modern banking, when a general deposit is made, the implied, if not the express, promise by the bank to the depositor is that the bank will pay the depositor's checks, in sums to suit his convenience, in the order of their presentation, to the extent of the deposit; and this promise is held out to the community as an inducement to patronage and public confidence, for the benefit of all who have occasion to receive the checks of the depositor in the usual course of business. Hence when a bank, having sufficient funds of a depositor to pay his checks, refuses to make such payment upon proper presentation, it would seem that the check-holder must have a right of action directly against the bank for the violation of the promise made for his benefit. The reasons in support of this view are numerous and most convincing. I shall not undertake to elaborate them, preferring, under the circumstances in which this opinion is prepared, to quote from standard authorities and cite leading judicial decisions in support of the view announced in this opinion.

In Daniel on Negotiable Instruments (vol. 2, p. 653 *et seq.*) we find the following: " The objection to the check-holder's suing the bank, on the ground that there is no privity between him and the bank, seems to us utterly untenable. It is true there is no privity before the presentment of the check, but by that very act they are brought in privity, and the check-holder's right to sue the bank completed. The sole motive often, if not generally, inducing the depositor to place his funds in bank, is the desire to have them in safety, where they may be checked on at convenience. The bank receives its reward in the use of the money, and in the business attracted in checking it out; and it is the universal understanding between banks and depositors, arising from the customs of trade, that the check of the latter is to be paid upon presentment. The United States supreme court so declares in a recent opinion, though

as yet it has not followed that declaration to its logical sequence. The drawer of the check makes the deposit, and draws the check with this understanding. The bank receives the money with the like understanding, and so the holder receives the check; and the mutual understanding of the parties, although they have not individually concerted together, creates an implied privity, and completes the contract between them.  *  *  *  As an acceptance of a bill may be implied, so may the acceptance of a check; and, as a promise to accept will operate as an acceptance to the holder who takes a bill on the faith thereof, so should it be as to a check. Now, by the very act of drawing a check, the drawer communicates to the payee the fact that the bank holds that amount to his credit which it has agreed to pay on his check. By receiving the deposit, the bank has impliedly so agreed; and the holder receiving the check in reliance on this condition of things should be sustained, provided the drawer has not deceived him by drawing without funds to meet the check.  *  *  *  It is no answer to these views to say that the holder of a bill cannot sue the drawee unless it be accepted. The drawee of a bill does not receive money to be paid out on checks. And the distinction between the bank or banker on whom the check is drawn and the ordinary drawee of a bill is the very gist of the distinction between the rights of the holders of the different instruments."

In Morse on Banks and Banking (3d ed. § 493 *et seq.*) the learned author says: "The most numerous body of decisions sustains the view that a check is neither a legal or an equitable assignment as between drawer and payee, nor a sufficient foundation for any action by the holder against the bank.  *  *  *  Another class of cases affirm that a check is an assignment as between drawer and payee,  *  *  *  and that, upon presentment, the bank is brought into privity with the holder, and is liable to him for improper refusal to pay.  *  *  *  Upon this side we find a goodly array of authorities, and all the advanced, clear, in-

dependent thought and reasoning.   \*  \*  \* . The plain common sense of the holder's rights would seem to be \* \* \* that, as between the bank and the holder, presentment for payment works a transfer of the fund. If the unincumbered funds in its possession are sufficient, and this fact is within the knowledge attainable by the bank with reasonable diligence, it is the duty of the bank to pay the check. It is bad faith on its part, or negligence, not to do it, and the check-holder is directly injured by its wrongful conduct. What more does the law require as the basis for a right of action?   \*  \*  \*  Legal analogies are plenty and forcible. B. writes: 'I promise to pay D. or order $100 on demand.' D. orders the money paid to H. It is perfectly clear that H. can sue B. if he refuses to pay according to his promise. B. has in fact promised to pay H., for he engaged to pay to whomsoever D. should order, and H. is D.'s order. Now, a bank receiving $100 on general deposit impliedly promises (by the universal understanding of trade, as ascertained in innumerable and unbroken decisions) to pay that money to the depositor, or such persons, and in such amounts, as he may order. Where, then, is the difference between the position of the holder of a check and the indorsee of a note? The amount is fixed in the note from the start. In the check, however, B. only says you must not go beyond your deposit, but you may fill in the check for a less amount if you wish, and I will pay it. That is a promise to pay the amount of a properly drawn check, just as truly as a note is a promise to pay the amount named in it. As soon as the check is drawn and presented, the promise takes effect on the definite amount. The only other difference is that one promise is in writing, and the other verbal or tacit; but this can make no substantial difference, except as opening the door to the fraud of a depositor who draws more than one check against the same money; and this can never affect the bank, as its promise and duty are only to pay checks as they are presented. It is a general rule of law that, if a

promise is made by B. to D. for the benefit of H., the latter can sue B. for the breach. From this principle also results, as a corollary, the right of a check-holder to sue the bank. Suppose the drawer fails after the bank's refusal to pay the holder, and he loses half the amount of it, or suppose, after refusal, the drawer checks out the money himself, and absconds, or is found to be utterly worthless; the holder loses the whole value of the check by reason of conduct on the part of the bank which all the cases agree in condemning as wrongful and contrary to its duty. What must we think of a system of law that claims as one of its fundamental maxims, 'Wherever there is a right there is a remedy,' and proclaims that for every injury the law will give redress, and yet denies the right of the check-holder to sue the drawee? We hope that it will not be many years before it will cease to be possible to find this blot on the common law. No amount of deciding in the United States supreme court, nor in any other chamber of wisdom, can make the unjust just; and as surely as the Dred Scott decision is dead, so surely will the decision in *National Bank of the Republic v. Millard* die with the judges who rendered it." See notes and cases cited by the author in connection with the foregoing.

In Story on Promissory Notes (section 489) the eminent author says: " Checks have many resemblances to bills of exchange, and are, in many respects, governed by the same rules and principles as the latter. But *nullum simile est idem;* and their nature, obligation and character are in some respects different from those of common bills of exchange. The circumstances in which they principally differ from bills of exchange, or at least from bills of exchange in ordinary use and circulation, are: (1) They are always drawn on a bank or on bankers, and are payable immediately on presentment, without any days of grace. (2) They require no acceptance, as distinct from prompt payment. (3) They are always supposed to be drawn upon a previous deposit of funds, and are an absolute appropriation of so

much money in the hands of the bank or bankers to the holder of the check."

Mr. Justice Sharswood of the supreme court of Pennsylvania, in his notes to Byles on Bills (pages 21, 22), says: "A bill of exchange is not an equitable assignment or appropriation, but the cases treat a check on a banker as such; and if the holder is a holder for value, as to whom the drawer cannot revoke rightfully the power which he holds, coupled with an interest, why should not the banker, upon distinct claim and notice, be held bound by the equity?"

The views of the text-writers as above stated are based upon strong and well-reasoned opinions from the highest courts of several states, squarely and emphatically declaring the liability of banks and bankers to the *bona fide* checkholders of their depositors. *Munn v. Burch*, 25 Ill. 35; *Roberts v. Austin*, 26 Iowa, 323; *Lester v. Given*, 8 Bush, 357; and *Fogarties v. Bank*, 12 Rich. Law, 518,— are leading cases upon the question. Other decisions, tending in the same direction, are referred to in the notes to Daniel's and Morse's works, *supra*. It is not my purpose on this occasion to attempt a citation and analysis of the many authorities bearing upon this question. From the weight and strength of the authorities already quoted, it will readily be perceived why I cannot approve the doctrine that banks and bankers may wrongfully refuse to pay their depositors' checks without incurring any liability to *bona fide* checkholders. Hence I regret that certain portions of the opinion prepared by Mr. Commissioner REED should have been promulgated without a thorough re-examination of the question. It seems to me exceedingly unfortunate that the opinions of this court should be arrayed on the wrong side of such an important question of commercial law. It is most desirable that upon this question, as upon others, our decisions should be ranked with those of "advanced, clear, independent thought and reasoning."