No. 18,230.

Arthur Cox, et al. *v.* Metropolitan State Bank, et al.
(336 P. [2d] 742)

Decided February 24, 1959.   Rehearing denied March 30, 1959.

Mr. Lennart T. Erickson, Mr. Philip A. Rouse, for plaintiffs in error.

Messrs. Ireland, Ireland, Stapleton & Pryor, Mr. William B. Naugle, Messrs. Daniel & McCain, for defendant in error Metropolitan State Bank, Inc.

*En Banc.*

Mr. Justice Moore delivered the opinion of the Court.

This action was first presented to this court in cause No. 17,877 which was decided October 8, 1956, *Metro-*

*politan State Bank, Inc. v. Arthur Cox, et al.,* 134 Colo. 260, 302 P. (2d) 188. In that opinion the trial court was required to reconsider the evidence and to determine whether at the time the bank accepted a deed from one William E. Rust it had knowledge of the existence of a second deed of trust on the real estate conveyed to the bank by said warranty deed. Pursuant to this mandate, and consistent with the direction of this court, the trial court on December 7, 1956, disposed of the case and entered judgment in favor of the bank as against the claims of all plaintiffs in the three cases which were consolidated for trial. Writ of error directed to that judgment is now before this court for consideration upon the full record.

To properly understand the case as now presented, our opinion in the first case should be referred to, where a full statement of the pleadings and the findings of the trial court appear. Suffice it to say here that one Rust was a dealer in automobiles, tractors and trailers; that he had conducted his banking business with the defendant bank for several years and the bank was familiar in a general way with his method of operation; that in some instances Rust acted as an agent of the owner in disposing of such vehicles, in other instances he would buy them outright, and upon occasion he would sell trucks, cars and trailers on commission. At the time of his dealings with Cox (one of the plaintiffs in the trial court) Rust owed the bank (defendant in the trial court) approximately $8,000.00 which indebtedness was long past due and the bank had for some time been attempting to secure collection, without success. A warranty deed was delivered by Rust to the bank for the purpose of liquidating his debt. This deed excepted a first deed of trust of $13,000.00 and the bank admits knowledge of this lien. The deed covenanted that the property was free and clear of any other liens, when in fact there was a second deed of trust of record against the real estate at the time the deed was executed. The bank denied any knowledge

thereof and upon discovery of the existence of this trust deed it rescinded its agreement releasing Rust from his debt and seized the sum of $6,270.94, being the balance on deposit in his checking account at the time. He had deposited to his general account a check for $6,120.00 the day before the seizure. This check was received by him as payment in full for a tractor which he had sold and which was owned by Cox. The arrangement between Cox and Rust was that the latter would find a purchaser for the tractor and would keep as his commission all sums received in excess of $5,000.00. Rust had delivered to Cox three checks totaling $5,000.00, but due to the seizure of the said deposit by the bank, checks representing $4,500.00 payable to Cox were unpaid. Cox brought his action against the bank claiming that the deposit of Rust was a special deposit for a specific purpose and that the bank knew or had reason to know that said deposit was a special one.

The $6,120.00 check received by Rust from the purchaser of the tractor was drawn on a bank in Vernal, Utah. In order to expedite clearance of the checks issued to Cox, Rust consulted officials of the bank and was advised to secure a telegram from the Utah bank accepting the charge against the account upon which it was drawn. Such a telegram was received by the local bank and thereupon Rust's account was credited with the amount of the deposit. An official of the bank admits that at the time the deposit was made he conferred with Rust in a private office for a period of time estimated to be between ten minutes and half an hour, and that at this conference the ledger card concerning Rust's indebtedness was on the table. Rust testified that the full nature of his dealings with Cox was told to the bank official during this conference and that the bank was informed that $5,000.00 of the money represented by the check belonged to Cox. Rust further testified that the bank official promised not to seize the funds for applica-

tion to Rust's indebtedness and that this promise was made prior to making the deposit.

Officials of the bank denied that they had any knowledge whatever which might charge them with notice that the check involved trust funds. They testified that Cox was not mentioned. It is admitted, however, that a check for $500.00 drawn by Rust in favor of Cox was cashed since Rust had a sufficient balance for the payment of this check prior to the deposit of the draft on the Utah bank.

In the other cases which were consolidated for trial, The Tribune Grain, Inc., and Sullivan, Inc., sought to recover against the bank upon checks held by them upon which payment was refused following the seizure of Rust's funds by the bank. In these transactions Rust bought grain from the corporations, giving the checks drawn on the bank in payment therefor. Unless the bank is bound by its acceptance of the deed to discharge the debt of Rust, the vendors of the grain have no remedy against it.

Following the mandate of this court in cause No. 17,877 the trial court found specifically that the defendant bank had no actual or constructive notice of the existence of a second deed of trust at the time the deed from Rust was delivered to it. There is competent evidence to support this finding of fact and in such circumstances we are not warranted in disturbing it. Apart from the contention that Rust's obligation to the bank had been cancelled by acceptance of the deed, and because thereof the bank had no right to set off the deposit against the claimed indebtedness of Rust, there is no legal basis for the claims of the Tribune Grain, Inc., and Sullivan, Inc. We are bound by the finding of the trial court and accordingly affirm the judgment as to these two plaintiffs.

A different situation exists with reference to the claim of Cox as between him and Rust. $5,000.00 of the money represented by the check for $6,120.00 was unquestion-

ably received by Rust as trustee for the use and benefit of Cox.

Although the assignment of title to the tractor which was executed and delivered by Cox has the name of Rust as assignee therein, it would seem clear that it was delivered in blank by Cox since Rust acknowledges that he placed his own name on it after receiving it upon giving the last of three checks totaling $5,000.00 to Cox on December 20, 1954. He explained at length the reason he placed his own name as assignee on the title to the tractor and used a printed form, No. 411 Dealer's Bill of Sale, for the purpose of securing title in the purchaser. In this connection we quote the following testimony:

"Q. Now, whether you bought the tractor or whether you had it on a commission basis the transaction so far as the title is concerned would be handled the same, would it, Mr. Rust? A. If I bought it? Q. Yes, for resale. A. It would be handled the same to go through the dealer, to secure a title for the purchaser. It would have to be handled the same way. It wouldn't make any difference whether I owned it or not. If I transfer it on the 411, that is the way it has to be. Q. Well, the title could be assigned direct across to B&M, could it not? A. To B&M? Q. Yes, assigned to them and they could get a new title? A. It can be that way if they receive a permit to drive it to their courthouse, if they take the title from me and go to their county clerk's office without taking the truck home with them. This B&M Service is in Rangely, and it has to go from the dealer to the purchaser and then from the purchaser to the state to secure title. I had gotten instructions concerning that from the dealers association. Q. Regardless of whether it is a sale and a purchase of the truck you would use identically the same titles, is that right? A. That is the only title there was to the truck."

We are satisfied that the insertion of the name of Rust as the transferee of the title under these circumstances, which are not disputed, did not in any manner change

the nature of the relationship existing between Cox and Rust. The testimony of Rust in this connection is:

"A. My contract with Mr. Cox was that I was to sell his piece of equipment and all over five thousand dollars was my commission for selling that piece of equipment for him. Now, I received that piece of equipment in October, I believe, and I had several deals on it and several deals that were attempted to be financed through the Metropolitan Bank, * * * "

The testimony of Cox in this connection is as follows:

"Q. Mr. Cox, I direct your attention to on or about the 20th day of December 1954. On or about that time did you have any business dealings with Mr. William E. Rust? A. Yes, Mr. Rust was selling a truck for me. Q. Did you at any time transfer title to Mr. Rust? A. I did on December 20th when I received the final check from Mr. Rust. Q. And to your knowledge was that title turned over to the purchaser of the truck? A. It was turned over to the purchaser. It wasn't — Well, I signed the title over and received the check, see? Q. On what date? A. December 20th. Q. 1954? A. 1954. Q. And did you receive checks from Mr. Rust in payment for that tractor? A. Yes, I did. I received three checks."

The deal for the sale of the tractor was made by Rust on December 15. He expected to receive a certified check in payment of it but on December 20 he received the check which was not certified. On December 18, upon the request of Cox for some money, Rust gave him a check for $1,000.00 and on December 20, additional checks for $500.00 and $3,500.00 were drawn by Rust and delivered to Cox. Cox then signed the title and delivered it to Rust. The bank did not in any manner change its position by the extension of additional credit to Rust, nor did it in any manner whatever suffer detriment in reliance upon the trust funds deposited by Rust in his general account at the bank. Its status as a creditor of Rust remained the same after the deposit of Cox's money as before.

The judgment of the trial court entered following our first opinion in this controversy contains a statement to the effect that the check given Rust in payment of the tractor belonging to Cox was not received by the bank as a "special deposit." This is tantamount to a finding that the bank had no notice of the trust nature of the transaction between Rust and Cox. We are bound by this finding of fact for the reason that there is competent evidence to support it. The trial court further entered a finding that the funds in Rust's account which the bank seized, "were not trust funds." We conclude as a matter of law that this finding is without support in the evidence. We resolve all disputed questions of fact in the light most favorable to the position of the defendant bank and determine whether as a matter of law it was entitled to seize that portion of the deposit which Rust intended to go to Cox as payment for the tractor.

Question to be Determined.

*Where an agent has money in his possession belonging to his principal, which he deposits in his own general bank account with the intention of paying the sum due his principal by check drawn on that account; and where at the time of the deposit the agent is indebted to the bank on a past due obligation, and the bank accepts the deposit without knowledge that the agent holds the money in trust for the benefit of his principal, and sets off the amount of the debt of the agent against the deposit; where at the time the bank applies the deposit on the debt of the agent it has not changed its position to its detriment in reliance upon said deposit; can the principal recover from the bank that portion of the deposit which the agent held in trust for his use and benefit?*

The question is answered in the affirmative. This court has held that money may be traced as a trust fund although it has no earmarks. *Gillett v. Moore,* 74 Colo. 484, 223 Pac. 21. We need not cite authority for the general proposition, well settled in the law, that whenever property held in trust has been misapplied it

may, if it can be traced, be followed and subjected to the use of the cestui que trust unless it has been acquired by an innocent purchaser for value without notice of the existence of the trust.

Another principle of law interwoven in this controversy is the rule that the relationship between a bank and a depositor is that of debtor and creditor. The deposit of money in the general account of a depositor transfers ownership of the money to the bank. The obligation of the bank to its depositor is to pay out funds only to him or upon his written order. *American National Bank of Denver v. First National Bank of Denver, et al.,* 130 Colo. 557, 277 P. (2d) 951. One of the qualifications of this obligation of the bank is the general rule that in the absence of unusual circumstances the bank has the right to set off against the account of the depositor the past due obligation of such depositor to the bank.

The precise question which we are called upon to determine under the record before us has been before the courts of last resort on numerous occasions. We have read many reported decisions from several jurisdictions and are of the firm conviction that the so-called "federal" or "equitable" rule is best supported by reason and best serves the demands of justice. Notwithstanding that former decisions of this court may have seemed to commit us, we have given the problems presented a thorough re-investigation and have determined now, and hereafter, to follow the "equitable" rule.

The issues of law are treated so thoroughly in *Agard v. People's Nat. Bank,* 169 Minn. 438, 211 N.W. 825, that we need do no more than quote from that opinion. In considering the following quotation one needs only to substitute the name of Rust for that of Lindbergh since Lindbergh occupies the position of Rust in the case at bar.

"The bank did not change its position nor suffer detriment on the faith of the deposit in Lindbergh's name of

plaintiff's money. So it has no equity superior to that of plaintiff, there being no anomalous and dominant quality in the banker's right of offset. The argument contra is put upon the currency of negotiable paper, and the 'ancient foundation that money has no earmarks and therefore when honestly taken can be kept.' What is meant is that where money has been honestly received, for a consideration and without notice, in the independent right of the taker himself, as in payment of a debt, it may be kept. But the same author goes on to say that:

" 'Modern jurisprudence is assailing this rule. The truth is recognized that money has no more sacredness than other kinds of property, and that the true owner ought under many conditions to recover his own, especially when the receiver would not be in a worse state than he would have been had it not been paid to him.' Bolles, Modern Law of Banking, 748.

"But while money has no more sanctity than any other property, and not as much as some, it has, and must continue to have, a currency, a fluidity, that is denied other property. That quality must continue or it will cease to be money. But allowing fully the premise, building even on this 'ancient foundation' of no earmarks, how can it follow that a bank, more than any one else, can by its own act, unaided by superior equity, appropriate the money of another which happens quite by chance and temporarily to have been placed in its control? Here it was intended to be merely the conduit of that money on its way to the rightful owner. * * *

"What has happened to plaintiff's right to his money? Nothing but the unilateral act of the bank in asserting a right of offset. But no equity attends that right — at least none superior to that of plaintiff. The bank has not changed its position on the faith of the deposit. It certainly did not accept Lindbergh as a depositor, nor loan him money, nor buy his notes, expecting payment out of any funds not his own.

"The currency of money and commercial paper and

the absence from the former of all earmarks have never, alone, procured their escape from equity's pursuit of trust property in the hands of those who, with notice or as volunteers or without consideration, have taken the property from the trustee. In such a case equity follows not only the original property but the proceeds if there has been a conversion into money. Pomeroy's Eq. Jur. (3d Ed.), §1048. The doctrine predicated upon the currency of money, the lack of earmarks, still applies where the trustee himself effects the conversion and uses the money of his principal or cestui in payment of his own debt. *Smith v. Crawford County State Bank,* 99 Iowa, 282, 61 N.W. 378, 68 N.W. 690. But that is not this case. Here the trustee did not make the application to the debt of the bank. His intention was to pay plaintiff. It was the bank alone which made the seizure, taking advantage of the fortuitous circumstances that made it a depositary of the fund. There was not even the implication that might have arisen if Lindbergh's account had been overdrawn when the deposit was made. In such a case, the depositor himself authorized the offset and uses another's funds to pay his own debt."

We approve the following quotation from the early case of *Burtnett v. F. N. Bank of Corunna,* 38 Mich. 630, under facts pertinent to those present in the instant case:

"But we are not aware of any principle which will enable a depositary who has received from a trustee or agent a fund belonging in fact to the principal or beneficiary, to appropriate it by his sole act to his own debt held against the trustee or agent and thereupon to insist that his want of knowledge of the true ownership is sufficient to guard such inequitable appropriation and bar the real owner from pursuing the fund."

Supporting the forceful language hereinabove quoted numerous authorities could be cited. A few of them are the following: *George D. Harter Bank of Canton, Ohio, v. Inglis,* 6 F. (2d) 841; *Curtis v. Hart,* 26 S.W.

(2d) 420; *Western Shoe Co. v. Amarillo Nat. Bank,* 127 Tex. 369, 94 S.W. (2d) 125; *Swift v. Williams, et al.,* 68 Md. 236, 11 Atl. 835; *Cady v. South Omaha Nat. Bank,* 46 Neb. 756, 65 N.W. 906; *Merchants & Farmers' Bank & Trust Co. v. Hammond Motors, et al.,* 164 La. 57, 113 So. 763; *Brady v. American Nat. Bank of Oklahoma City,* 120 Okla. 159, 250 Pac. 1006; *Shotwell v. Sioux Falls Savings Bank,* 34 S. D. 109, 147 N.W. 288. The opinion of the Supreme Court of Minnesota in *Berg v. Union State Bank,* 179 Minn. 191, 229 N.W. 102, contains a reference to other cases supporting the "equitable" rule which we adopt.

To the extent that the opinion of this court in the early case of *Boettcher v. Colorado Nat. Bank,* 15 Colo. 16, 24 Pac. 582, is out of harmony with the views herein set forth, it is expressly overruled. The case of *Sherberg v. First Nat. Bank of Englewood,* 122 Colo. 407, 222 P. (2d) 782, was one in which recovery was had upon proof that the deposit there in question was a "special deposit," and by acceptance thereof the bank "impliedly binds itself not to set off against such deposit a debt due it from the depositor." The present case is clearly distinguishable on the facts. However, in the Sherberg case, in discussing the law some language appears which is not essential to a determination of that case which might tend to support adherence to a rule opposed to that which we follow in this opinion. To such extent as necessary to harmonize with our views expressed herein, the Sherberg opinion is modified.

In the instant case the bank filed a counterclaim against Rust in which it alleged that after its seizure of the funds it obtained judgment against Rust in a separate action for the amount of the debt owed by him after the setoff. It is alleged that in the event Cox should recover against the bank, equity requires that the bank be awarded judgment against Rust for a like sum. Rust, although served with process in the instant case, has entered no appearance herein and has not taken issue

with this prayer of the bank for relief against him. Under these circumstances, and in view of our determination that Cox is entitled to judgment against the bank in the sum of $4,500.00, a judgment for this sum should enter in favor of the bank against Rust.

The judgment is reversed and the cause remanded with directions to enter judgment in favor of Cox against the bank for $4,500.00 plus interest from December 20, 1954, and costs; judgment shall enter in favor of the bank against Rust for a like sum.

MR. JUSTICE SUTTON and MR. JUSTICE FRANTZ specially concurring.

MR. CHIEF JUSTICE KNAUSS and MR. JUSTICE HALL dissent.

MR. JUSTICE SUTTON specially concurring:

I concur in the majority opinion except insofar as it is based upon the premise that the bank had accepted the deposit *without knowledge* of its special status.

The original agency relationship of Rust, as agent, and Cox, as principal, is admitted by all. This agency continued through the deposit and until Cox received his money. In my opinion it is immaterial whose name appeared on the certificate of title, or what money Rust may have advanced to Cox, or what agent or means Rust used to transfer title and possession to the purchaser, it was still Cox's truck until the purchaser (B & M) paid for it. Rust was a mere conduit through which the purchase money, less commission, was to flow to Cox.

I am in agreement with the majority opinion in concluding that the trial court erred as a matter of law in finding that this purchase money was not a trust fund as between Cox and Rust. I would go further and say that as a matter of law the bank knew this was trust money and specially deposited. It is undisputed that Rust had tried to sell the Cox truck to several other pur-

chasers. It also appears that either those attempted sales or at least sales of other equipment "were attempted to be financed through the Metropolitan Bank"; that Rust had been to the bank about this particular sale before making the deposit and during his discussion with the bank's official his ledger card was on the table; and the bank itself had Rust secure a telegraphed guarantee of the purchaser's check from the Bank of Vernal, the telegram being directed to and received by the bank.

Common sense dictates that Rust, a businessman who owed past-due obligations to the bank, would not have deposited this check in his account and forthwith drawn a check thereon to Cox for his share, unless he was satisfied that the bank would not seize it to discharge his own obligations.

Since the bank under the facts here is chargeable with knowledge of the nature of the funds and the purpose of their deposit, it makes no difference whether it changed its position in any way as a result of the entire transaction, it could be in no worse position as a creditor of Rust than before, and only improved its position by appropriating Cox's money to the payment of Rust's debt.

This was a simple sale through Rust to B & M. To hold otherwise would be to countenance a rule which would do violence to established principles of agency, as well as the rules relating to the right to trace trust funds.

Cox is entitled to his $4,500.00 together with interest and costs from the bank. Tribune Grain Inc. and Sullivan, Inc., can, as the majority opinion holds, recover nothing.

MR. JUSTICE FRANTZ specially concurring:

It is my conviction that aim has not been directed toward the center of the problem presented by the record in this case, but rather, and at best, toward peripheral questions, all of which induce me to urge that we resolve the only question which, in my opinion, invites

solution, and which would be dispositive of this controversy. I respectfully expostulate with my colleagues that we miss the point of the case in directing our considerations to questions of who owned the vehicle, tracing trust funds, and so forth.

Open sesame to the solution of the dispute between the parties is the conduct of Rust and the Bank on December 20, 1954, at about the hour of four o'clock in the afternoon. Deposit of the check was made at that time, and in this connection it is important to remember the interplay of the components of this transaction. Whatever the incidents, circumstances and negotiations may have been, leading to the deposit of the check (and there is considerable contrariety of testimony on these matters), they were merged in that certain instrument, the deposit slip.

At the time of acknowledging receipt from Rust of the check drawn by B. & M. Service in the sum of $6,120.00 from which was deducted $325.00 cash paid to Rust, the deposit slip recited:

"All deposits are accepted for collection only and credited subject to final cash payment and are handled at risk of depositor. Credit is given conditionally, this bank reserving right to charge back to depositor all unpaid items or returns therefor which are unpaid, although item itself is not returned, items on this bank not found good will be charged to depositor. This bank will use due diligence in selecting responsible collecting agents but will not be responsible for their acts or omissions, negligent or otherwise, or for loss of items in mail."

It has been held that such a deposit slip is contractual in nature, *First National Bank of Denver v. Henning,* 112 Colo. 523, 150 P. (2d) 790; *American Savings Bank & Trust Co. v. Dennis,* 90 Wash. 547, 156 Pac. 559; *Ryan v. Columbia National Bank,* 142 S.C. 231, 140 S.E. 593, and "that pursuant to the provisions of the deposit slip, [the] bank, at the time of deposit, was merely an agent to collect." *Bromfield v. Cochran,* 86 Colo. 486, 283 Pac.

45. Involved in the latter case was a deposit slip containing language concerning the bank acting as agent similar to that appearing in, and quoted from, the deposit slip in question.

Receipt of the check, payment of $325.00 to Rust, and use of the deposit slip with the quoted language were all parts of one act. The conditions contained in the deposit slip, if rendered ambiguous by the circumstances, must be construed most strongly against the bank, the drafter of the provision. *People's Gin Co. v. Canal Bank & Trust Co.,* 168 Miss. 630, 146 So. 308. "Whatever the rule may be in other jurisdictions, and there is some conflict in the authorities, it seems to be reasonably well settled in this state that, where a check is received and deposited as in this case, and the depositor checks against it with the understanding that, if the bank fails to collect the check, the amount is to be charged back, the check remains the property of the depositor, and title thereto does not pass to the bank. *The allowing a depositor to check against such paper is a mere gratuitous privilege.*" (Emphasis supplied.) *American Savings Bank & Trust Co. v. Dennis,* supra. See *Joppa v. Clark Commission Co.,* 132 Ore. 21, 281 Pac. 834; *E. A. Tovrea & Co. v. Degnan,* 27 Ariz. 539, 234 Pac. 820.

The written right to charge the checks back is indicative of the bank's status as agent for the depositor. *First National Bank v. Fleming State Bank,* 74 Colo. 309, 221 Pac. 891; *First National Bank of Denver v. Federal Reserve Bank,* 6 F. (2) 339. In the latter case Judge Phillips spoke for the court of this federal circuit, and said:

"Although the checks were indorsed in blank, they were indorsed and deposited to be transmitted for collection, and the credit given therefor in the account of the Lumber Company with the plaintiff bank was subject to the right to charge the checks back to such account if payment therefor in cash was not received. *Such*

*being the facts, the indorsement did not transfer the title to the checks to the plaintiff.*" (Emphasis supplied.)

The relationship between a bank and its depositor, whether that of agent and principal or debtor and creditor, cannot be unilaterally changed. "If the admitted relation of principal and agent is to be suddenly changed to that of debtor and creditor, such a result must be brought about by some definite act, and it seems to us that this definite act must be one concurred in by the principal, as the relation of debtor and creditor is a contractual relation and bilateral in its inception." *People ex rel. Nelson v. People's Bank & Trust Co.,* 353 Ill. 479, 187 N.E. 522, A.L.R. 1328.

"In the absence of a contractual agreement to that effect, a bank which has received an item as agent for collection cannot change its status as agent into some other relation, such as that of debtor, at its will and without notice for its own purpose or for the benefit of a sub-agent." 9 C.J.S. 507, Sec. 248. "A bank cannot divest itself of a trust relation and assume the other at its own convenience. The transformation does not effect the depositor unless this is known by him, either by agreement or usage." *Hall v. Beymer,* 22 Colo. App. 271, 125 Pac. 561. See *Charles Hing v. Joe Lee,* 37 Calif. App. 313, 174 Pac. 356.

We are dealing with the deposit of a check, and not cash. "When, as here, a check is indorsed in blank by the payee, and placed in a bank other than the one on which it is drawn, whether such a transaction constitutes a sale of the check to the first bank or is merely a deposit for collection depends upon the facts and circumstances attending the transaction. If it is a sale title passes to the bank in which the deposit is made, if it is for collection only, or the check is deposited as a check, the relation of debtor and creditor does not arise, and the check remains the property of the depositor, and is in the hands of the bank as his agent for collection, with title still in the payee, and not in the indorsee. * * *

"In this state the general custom and understanding is that, when a customer deposits in his bank checks drawn on another bank, they are received for collection, and are charged to the customer's account if dishonored. Some banks, by way of precaution, print upon their deposit slips notice to this effect. The banks, generally, in the absence of special notice,.regard such transactions as deposits for collection, and, even when credited to a checking account, the right recognized by the law merchant to charge back to the account a dishonored check is exercised. *Town of Manitou v. First National Bank of Colorado Springs,* 37 Colo. 344, 356, 86 Pac. 75." *First National Bank v. Fleming State Bank,* supra, cited with approval in *Bromfield v. Cochran,* supra.

See *First National Bank v. Henning,* supra, for an excellent application of the rule in a case involving conditions contained in the deposit slip similar in many respects to those in the deposit slip prepared by the bank and used by Rust in this case.

I submit that the deposit slip fixed the relationship of the bank and Rust; that relationship was one of agent and principal, under which Rust owned the check; that the relationship could not be changed by the unilateral action of the bank; and that all questions should be resolved in this case on the basis of Rust being the owner of the check.

Mr. Justice Hall dissenting:

I respectfully dissent from the majority opinion and the specially concurring opinions.

The right of a bank to apply general deposits standing in the name of and belonging to a depositor to the payment of such depositor's past due indebtedness to the bank is a right generally recognized throughout the United States. Colorado, as evidenced by numerous decisions of this and the former Court of Appeals, recognizes this right.

In *Manitou v. First National Bank,* 37 Colo. 344, 86 Pac. 75, it was said:

"When a bank holds a depositor's note, it has the right at any time during the day on which it falls due to apply funds in its hands, *belonging to the depositor,* to the payment of the note. * * *. The rule is thus stated in 3 Am. & Eng. Enc. of Law (2d ed.) 835:

" 'The right of the bank to apply deposits to the extinguishment of the depositor's indebtedness as it matures, grows out of the doctrine that the relationship between bank and depositor is that of debtor and creditor. The bank holds a lien upon the deposits in its hands to secure the repayment of the depositor's indebtedness, and may enforce that lien as the debts mature, by applying the debtor's deposits upon them, thus setting the two off against each other.' — *Bank v. Hughes,* 17 Wend. 94; *Scammon v. Kimball,* 92 U.S. 362; *Schuler v. Bank,* 27 Fed. 424.

"The above principle has been recognized by this court in *Boettcher v. Bank,* 15 Colo. 16." (Emphasis supplied.)

The law is equally clear that a bank may not apply a general deposit standing in the name of one depositor to the payment of the past due debt of another depositor.

In *Miller v. Mickel,* 9 Colo. 331, 12 Pac. 240, the bank had taken money from Miller's private account and applied it as payment on a past due indebtedness owing the bank by a mining company of which Miller was the treasurer. In holding that the bank had no authority so to do, the court said:

" * * * The court did not err in refusing to allow the overdraft on the account of the mining company as an offset against the individual claim of the plaintiff."

In *Sherberg v. Bank,* 122 Colo. 407, 222 P. (2d) 782, the bank took money deposited in the name of Ray Essert Industries, Inc., and on September 24, 1947, applied the same as payment on the personal note of Essert, which note was not past due and in fact did not become

due until October 10, 1947. There the court held that the bank had no right to offset the accounts for the reason that *the funds on deposit were deposited for a specific purpose, all of which was well known to the bank.* The end result of the *Sherberg* case could very properly have been reached on two grounds: (1) The bank had no right to apply the deposit in the account of "Ray Essert Industries Inc." to payment of Essert's personal note, *Miller v. Mickel,* supra; and (2), the note of Essert was not due at the time the deposit was seized.

Bearing in mind the foregoing general principles, let us examine the facts in this case. There is no dispute whatsoever as to what transpired between Cox and Rust. There is nothing in the record to indicate that Cox and the bank ever had any dealings with each other, except on December 20, 1954, when Cox appeared at the bank with Rust's check for $500.00, which was presented in the usual and regular course of business to one of the tellers and was by him paid, and the amount so disbursed was charged against Rust's account. There is nothing in the record to indicate that Cox and B & M Service Station of Rangely, Colorado (hereinafter referred to as B & M — the firm to whom Rust sold the truck), had ever had any business dealings. There is a sharp conflict in the testimony as to what if any knowledge the bank had of the dealings between Rust and Cox; however, the trial judge held that the deposit of B & M's check by Rust was a general and not a special deposit. The majority opinion states that this finding "is tantamount to a finding that the bank has no notice of the trust nature of the transaction between Rust and Cox. We are bound by this finding of fact for the reason that there is competent evidence to support it."

Thus, it appears that the majority opinion affirms the finding of the trial court that the bank had no knowledge of dealings between Cox and Rust.

As between Cox and Rust, the undisputed evidence shows that Rust, among other pursuits, was engaged in

business as a *licensed* and *bonded motor vehicle dealer,* who at times as agent sold trucks for others on a commission basis. In October of 1954 Cox was the owner of a truck which he delivered to Rust as his agent to sell; Rust was to receive for his services all amounts received in excess of $5,000.00. On December 15, 1954, Rust made a deal to sell the truck to B & M for $6,000.00 on condition that the body be lengthened. On December 16, 1954, Rust employed The Weber Body Company to lengthen the body and paid $320.00, the cost therefor, with his own check. On December 18, 1954, Cox, knowing that the truck had been sold, approached Rust for money and Rust gave to Cox his check for $1,000.00, which check Cox endorsed and delivered to one Dews as a payment on a home which Cox was buying. On the morning of December 20, 1954, Rust received through the mails from B & M a check in the amount of $6,120.00, being $6,000.00, the amount for which Rust had sold the truck, plus $120.00 sales tax. This check was drawn by B & M Service Station of Rangely, Colorado, on the "Bank of Vernal, Vernal, Utah," and was payable to the order of Rust. On receipt of this check, Rust contacted the defendant bank to find out how he could get this check cleared.

"Q. Well, now, isn't it a fact that you went over to the bank to arrange some way to get this check cleared? A. That's right."

I am not persuaded that this action on the part of Rust warrants the statement in the majority opinion that Rust took this action "in order to expedite clearance of the checks issued to Cox * * *." If such was the purpose of Cox, it was not disclosed to the bank for, according to the majority opinion, the bank was without knowledge as to the dealings between Cox and Rust. The bank advised Rust to have B & M call their bank and have it wire the defendant bank that the B & M check would be honored. Rust followed this advice and at about 3:30

P.M. the defendant received a wire from the Vernal bank stating that they would honor the check.

About noon of that day, December 20, 1954, Cox went to Rust's place of business, presented to Rust his Colorado Certificate of Title No. C526042 showing ownership of the truck in question to be in Cox; Cox signed before a notary public the "assignment of title," appearing on the reverse side of his certificate of title, and whereby he "for value received * * * hereby assign, transfer, and convey unto WILLIAM E. RUST * * * the motor vehicle described on the reverse side * * * and * * * warrant the title * * *."

On receipt of this title, Rust, already being in possession of the truck, and having lengthened it to suit the purchaser, gave to Cox two checks drawn on the defendant bank; one for $500.00, another for $3,500.00. These checks, together with the $1,000.00 check given to Cox on the 18th, represented the full amount of $5,000.00 that Cox was to receive. Cox promptly took the $500.00 check to the defendant bank and received his money on it as set forth above; he took the $3,500.00 to another bank and endorsed it and deposited it in his savings account. Thus ended the dealings between Cox and Rust, until this action was commenced December 30, 1954. There is no testimony in the record that Cox ever saw the B & M check or even knew the amount of it, to whom it was payable, or on what bank it was drawn or when; there is no testimony in the record that Cox ever gave to Rust any instructions or suggestions as to what should be done with the B & M check. Cox's understanding of his relationship with Rust on December 20th is well shown by the following from his testimony:

"Q. Did you at any time transfer title to Mr. Rust? A. I did on December 20th when I received the final check from Mr. Rust.

* * *

"Q. What were the amounts of those [checks]? A. * * * I had just bought a new home and Mr. Rust gave

598

me a check for one thousand dollars for a down payment on this home, and then the check didn't come in for the payment of the truck on the 18th so on the 20th I went down and he gave me the check for $3,500.00 and one for $500.00 *to complete the transaction."* (Emphasis supplied.)

Rust's understanding of his relationship with Cox on December 20th is well shown by the following from his testimony:

"Q. Then the title was in your name? A. For about — as long as it took the B & M Service Company to take this to the courthouse and change it over. * * *.

\* \* \*

"Q. In other words, the records would show you purchased the truck and sold it to B & M? A. Yes, it would show that for that length of time.

\* \* \*

"A. My contract with Mr. Cox was to receive all over five thousand dollars. Q. You paid him five thousand dollars for the truck? A. At the time of transfer of the title, on the 20th of December."

In the majority opinion it is stated that:

"$5,000.00 of the money represented by the check for $6,120.00 was unquestionably received by Rust as trustee for the use and benefit of Cox."

I find nothing in the record to justify any such conclusion.

As I view the situation, Rust on receipt of the check had no right to cash it, deliver it to Cox, or do anything with it, other than retain possession thereof until the transfer to B & M of the truck and title thereto; that such was the understanding between Rust and B & M is confirmed by their actions. As I further view the matter, Rust acted as agent for Cox up to the time Cox transferred title to the truck to Rust and accepted Rust's checks "to complete the transaction." Rust, on taking title from Cox and giving to Cox his personal checks totaling the amount Cox was supposed to receive, said

checks being received and accepted by Cox, had completely discharged his duties as agent, and the relationship of principal and agent existing between Cox and Rust was terminated for the reason that the purposes of the agency had been fully consummated. At that time a new relationship between Cox and Rust arose, that of creditor and debtor, as evidenced by Rust's checks payable to Cox. Rust on transfer of possession and title of the truck to B & M had discharged his obligation to B & M, save and except the obligation to warrant and defend the title of the truck as provided in his bill of sale, and obligations, if any, arising out of misrepresentation or fraud practiced by Rust in the sale of the truck; neither of said obligations was an obligation of Cox.

The check was received by Rust through the mails and there is nothing to indicate that B & M gave Rust any instructions; B & M was interested in acquiring title to and possession of a truck, rather than in creating a trust for the use and benefit of Cox, whom they did not even know. There is no testimony in the record that Cox ever had his hands on the B & M check, and even if he had placed it in Rust's hands, there is no testimony in the record to the effect that he instructed Rust to hold it, or $5,000.00 of it, in trust for Cox. In my humble opinion there is nothing in the record to indicate the creation of an express trust, nor does it show that Cox has discharged the burden resting upon him of proving that money credited to Rust's account, being in part the proceeds of the B & M check, were trust funds.

In *Botkin v. Pyle,* 91 Colo. 221, 14 P. (2d) 187, this court said:

"In order to establish a resulting trust, it is said: 'It is settled by a complete unanimity of decision that such evidence must be clear, strong, unequivocal, unmistakable, and must establish the fact of the payment by the alleged beneficiary beyond a doubt.' Pomeroy's Equity Jurisprudence (4th Ed.), Vol. 3, p. 2357. Further, in discussing the degree, as well as the quantum, of proof,

necessary to establish a constructive trust, the same author says: 'The existence of a constructive trust, as of a resulting one, must be proved by clear, unequivocal evidence.' Vol. 3, p. 2421. * * *. The burden of establishing either a constructive or resulting trust is upon him who seeks its enforcement. * * *."

In 9 C.J.S. 575, §275 (b), I find the following pertinent language:

"The term 'trust fund' has been defined as meaning a fund placed with a bank, not to become a part of its general assets, but to be used for a specific purpose. The mere fact that money deposited was to be used for a specific purpose does not make it a trust fund, but it becomes a trust fund only if deposited with the understanding that it should be set apart for a particular purpose and not mingled with other money of the bank; the mere form of the bank account as adopted by the owner is not sufficient to establish a trust, and the intent of the parties is ordinarily determinative of the question of whether or not a deposit constitutes a trust fund."

And in §276, the following:

"An unrestricted deposit of funds by a fiduciary is ordinarily regarded as general in character, and the fact that the depositor adds to his name words descriptive of the fiduciary character in which he holds the funds does not render the deposit a special one; nor does the fact that the deposit was one of trust funds made by a fiduciary raise a presumption that it was special."

I do not find in the record one word wherein Cox complains of any of the actions of his agent Rust, and yet on December 30, 1954, Cox brought this action and made Rust a party defendant. He does not complain of anything that Rust, as his agent, did or did not do; he does not claim anything from Rust as an agent; he claims from him as his debtor and proves Rust to be his debtor by introducing in evidence Rust's checks for $1,000.00 and $3,500.00 and obtains a judgment against Rust for $4,500.00. I find unsurmountable difficulty in recon-

ciling Cox's contentions on one hand that Rust was his agent to put $4,500.00 in the bank in Rust's name for the use and benefit of Cox, and on the other hand that Rust owes him $4,500.00 as evidenced by the two checks.

The learned trial judge at the close of the testimony, speaking of Cox, stated:

" * * * He received the check for one thousand dollars, and December 20th he received a check for $3,500.00 and then he received a check also on the 20th for $500.00, and he specifically requested whether or not he could go down and cash this check because he needed money. If the five thousand dollars was available in the checking account he would have been very happy to take it that day, before the six thousand dollars had been received from the purchaser of this tractor. So he didn't expect to be paid only out of this deal, so to speak; any source was sufficient for him. He didn't even look particularly to it, he just looks now because there are no other sources apparently. * * *."

Bearing in mind that the bank had no dealings with Cox and had no knowledge of the dealings between Cox and Rust, as the majority opinion holds, I fail to see by what process of reasoning the bank is now cast in the role of trustee and judgment debtor.

In my opinion the record shows, and the majority opinion does not find or hold to the contrary, that Cox, Rust, B & M, the Bank of Vernal, and the defendant bank all pursued their business in the ordinary way, in accordance with general business customs, in compliance with statutory requirements concerning transfer of titles to motor vehicles, collection and remittance of sales tax, and in conformity with the law merchant, and they should not be cast in new roles which they never learned or intended to play until Rust's checks were not honored.

As a court of review I perceive it to be our duty to determine whether the judgment of the trial court can be supported under the facts and law. It appears to me

that the majority has been over diligent in seeking for reasons to reverse rather than to affirm, even to the extent of setting aside findings of the trial court, findings which in my opinion are well supported by the record, and have gone further, and:

"To the extent that the opinion of this court in the early case of *Boettcher v. Colorado Nat. Bank,* 15 Colo. 16, 24 Pac. 582, is out of harmony with the views herein set forth, it is expressly overruled," and, "To such extent as necessary to harmonize with our views expressed herein, the Sherberg opinion [*Sherberg v. Bank,* 122 Colo. 407, 222 P. (2d) 782, supra] is modified."

I find nothing in the specially concurring opinion of Justice Sutton to change my views as above stated. Justice Sutton says:

"* * * I would go further and say that as a matter of law the bank knew this was trust money and specially deposited. * * *."

Only Rust testified that the bank had knowledge. The officers of the bank to whom Rust claimed he gave the knowledge categorically denied Rust's claims. The testimony is in direct conflict, and we have said in hundreds of cases that the trier of the facts, judge or jury, having heard the evidence, observed the witnesses, etc., is better able than we to pass on the matter, and that such findings will not be disturbed where there is evidence to support them.

In *Rocky Mountain Dist. v. Hix,* 136 Colo. 316, 316 P. (2d) 1041, this court stated:

"* * * We have adhered to the principle that the findings of a trial court based on conflicting testimony will not be disturbed so many times that citations on that point are no longer necessary."

Another statement in this "concurring" opinion, in my opinion, is unwarranted:

"Rust was a mere conduit through which the purchase money, less commission, was to flow to Cox."

The following undisputed facts negate this assertion.

Rust was the payee in the check; he endorsed the check with all of the attendant liabilities; he received title to the truck through statutory methods, the only recognized lawful method of transferring title; he transferred the title to B & M by methods provided by statute; he warranted the title; he and his corporate surety became liable on their $5,000.00 bond for any damages that B & M might suffer for fraudulent practices inducing the sale; he collected and remitted the sales tax; he issued his checks as payment for the truck. In my opinion these activities gave to Rust a status somewhat foreign to a "mere conduit."

Nor do I agree with the specially concurring opinion of Justice Frantz.

The law is well settled, as stated by Justice Frantz, that *usually* when a person endorses a check and tenders it for deposit, the bank becomes the agent of the depositor for collection and credit to the account of the depositor, with the right to charge back if the check is not honored, and this is especially true where, as here, there is printed on deposit slips, furnished by the bank to its customers, notations of the above conditions.

However, the law is equally well settled that the intentions of the bank and the depositor control and even though their intentions are in direct conflict with the terms set forth in the deposit slip.

In 9 C.J.S. 552, §270, it is said:

" * * * While such slip constitutes an admission by the bank that the relation of debtor and creditor has been created, and furnishes evidence of the date and amount of deposit, it is not conclusive, and the true state of the accounts and not the deposit slip or bank entry determines the rights of the parties.
* * *

"Deposit slips should be construed in accordance with the practical interpretation which has been placed upon them by the parties themselves before any controversy arose. A printed notice on a deposit slip, 'all items cred-

ited subject to payment,' does not invalidate the bank's title to a check deposited by the payee, nor show that credit was not given at the time of deposit, but merely indicates that the bank will charge the check back to the depositor if not collected."

In *National Bank v. State Bank,* 74 Colo. 309, 221 Pac. 891, this court said:

" * * * When, as here, a check is endorsed in blank by the payee, and placed in a bank other than the one on which it is drawn, whether such a transaction constitutes a sale of the check to the first bank or is merely a deposit for collection, depends upon the facts and circumstances attending the transaction. * * *."

In *Bromfield v. Cochran,* 86 Colo. 486, 283 Pac. 45, the transaction between the depositor and the bank was very similar to the transaction between Rust and the defendant, and the notations on the deposit slip included all notations on the deposit slip in this case. This court held that the parties by their actions made a purchase and sale of the check, and this in spite of provisions of the deposit slip to the contrary, used in making the deposit. It was there said:

"Applying these principals [principles] to the instant case, we must necessarily hold that the intention of the parties is controlling; that pursuant to the provisions of the deposit slip, plaintiff bank, at the time of deposit, was merely an agent to collect; that, *when it credited the amount of said check to the payees' account and thereupon paid to them $652.41 on account thereof, it thereby elected not to exercise the right to decline payment thereof as provided by the terms of said deposit slip; and that the payment so made and the receipt thereof by the depositor evidenced an intention of the parties that a sale of said check be consummated and the bank thereby became the owner of said check.*" (Emphasis supplied.)

In *Rosenthal v. Bank,* 129 Colo. 35, 266 P. (2d) 767,

this court quoted with approval the following language from 9 C.J.S., page 552, section 270:

"Deposit Slips. *A deposit slip is a mere acknowledgement by the bank that the amount named has been received,* and an indication of the customer's purpose to make a deposit. While such slip constitutes an admission by the bank that the relation of debtor and creditor has been created, and furnishes evidence of the date and amount of deposit, *it is not conclusive, and the true state of the accounts and not the deposit slip or bank entry determines the rights of the parties."* (Emphasis supplied in the above quote by the court.)

Considering the handling of the B & M check by Rust and the bank, in the light of the above cases, it seems clear that the bank became the owner of the check. The purpose of the telegram was to get the check cleared. The telegram did not serve to expedite the collection of the check; it did serve to induce the bank to give Rust immediate credit, to make the bank instead of Rust owner of the check. This is made even more plain when we find Rust preparing and the bank complying with a deposit slip showing the following:

| "B & M Service | | $6120.00 |
| Cash | | 325.00 |
| | deposit | $5795.00" |

By that transaction, in my opinion, the bank became the owner of the check; it paid for it by handing to Rust $325.00 in cash and giving to him immediate and irrevocable credit for $5,795.00. This is exactly what was held in the parallel case of *Bromfield v. Cochran,* supra.

I find not one word in this specially concurring opinion that sanctions one word of the majority opinion, and in my humble opinion it might with equal if not greater propriety be labelled "dissenting" instead of "concurring."

MR. CHIEF JUSTICE KNAUSS joins in this dissenting opinion.