GLENN JUSTICE MORTGAGE COMPANY, INC., a Texas Corporation, Plaintiff-Appellant in No. 77–1032,

v.

FIRST NATIONAL BANK OF FORT COLLINS, a National Banking Association, Defendant-Appellant and Cross-Appellee in Nos. 77–1030, –1031, and Appellee in No. 77–1032,

Sanford B. Hertz, as Receiver, and Horsetooth Associates, Ltd., a Limited Partnership, Defendants-Appellees and Cross-Appellants in Nos. 77–1030, –1031, and Appellees in No. 77–1032.

FIRST NATIONAL BANK OF FORT COLLINS, Third-Party Plaintiff-Appellant and Cross-Appellee in Nos. 77–1030, –1031, and Appellee in No. 77–1032,

v.

HUSKIN & COMPANY, a Colorado Corporation, Third-Party Defendant-Appellee and Cross-Appellant in Nos. 77–1030, –1031, and Appellee in No. 77–1032,

J. David Huskin, Third-Party Defendant.

Nos. 77–1030 to 1032.

United States Court of Appeals, Tenth Circuit.

Argued May 10, 1978.

Decided Feb. 5, 1979.

Charles R. Huddleson, of Fischer, Brown, Huddleson & Gunn, Fort Collins, Colo., for First National Bank of Fort Collins.

Patrick Owen, Denver, Colo. (with Fenton A. Bain, Denver, Colo., on the brief), of Law, Nagel & Clark, Denver, Colo., for Glenn Justice Mortg. Co., Inc.

Sanford B. Hertz, Denver, Colo., receiver for Horsetooth Associates, Ltd.

Before HOLLOWAY and McKAY, Circuit Judges, and STANLEY, District Judge.*

McKAY, Circuit Judge.

This is a consolidated diversity case in which three parties allege entitlement to funds deposited by a now-defunct limited partnership. Each party finds fault with the result reached by the district court. We do not.

## I.

The facts are essentially undisputed. Horsetooth Associates, Ltd. (Horsetooth), a Colorado limited partnership, sought to construct a mobile home park near Fort Collins. Financing was obtained from the First National Bank of Fort Collins (Bank) on June 30 1971. Although the Bank loaned $740,000 to Horsetooth to fund Phase I of the project, the loan agreement specified that the lender had no obligation to fund Phase II unless certain conditions were met. Horsetooth subsequently opened a checking account with the Bank, informing the Bank that the account would be used to deposit rental income from the mobile home park. No limiting purpose for the account was specified on the account signature cards.

The Bank made a second construction loan to Horsetooth on 9 May 1972. This loan, for $80,000, was evidenced by a promissory note signed by Huskin & Company, Horsetooth's general partner, and by J. David Huskin, the general partner's presiding officer. Although this note was to mature on 8 October 1973, it contained an acceleration clause that could be invoked upon the debtor's insolvency or upon the creditor's deeming itself to be insecure.

In early 1973 it became clear that Horsetooth would be unable to meet the Bank's conditions for Phase II financing. To continue construction, Horsetooth sought alternative funding from Justice Mortgage Investors (Justice), the assignor of Glenn Justice Mortgage Company.[1] Justice agreed to loan $775,000, taking a lien on the project as security. Additional construction funds were still required, however. To acquire them, an agreement was reached whereby Horsetooth would deposit $25,000 of its own

---

* Of the United States District Court for the District of Kansas, sitting by designation.

1. For purposes of this opinion, Glenn Justice Mortgage Company and Justice Mortgage Investors will be treated as the same entity, and will be referred to as "Justice."

funds with Justice's disbursing agent and would obtain a letter of credit for Justice's benefit. Horsetooth arranged for the letter of credit with the Bank and executed a $60,000 promissory note in the Bank's favor on 27 April 1973. This note, which contained no acceleration clause, was to mature on 1 February 1974. The Bank then issued a $60,000 irrevocable letter of credit for the benefit of Justice. The loan from Justice to Horsetooth was closed in July of 1973, and the Bank was paid all amounts due under its original Horsetooth construction loan. In addition, the balance on the May 9 note to the Bank was reduced to $10,001.

In September of 1973, Justice's disbursing agent made draws against the letter of credit of $12,700 and $34,979 and deposited these in its own account. On September 20, the agent issued a $47,679 check to Horsetooth, which was deposited in Horsetooth's account with the Bank. More than $62,000 was deposited in this account during the month. By the end of September, however, all that remained in the account was the disputed $34,279.

During this period of time, Horsetooth's general partner, Huskin & Company, was experiencing serious legal and financial difficulties. They culminated on 26 September 1976 when the Colorado Securities Commissioner brought an action against Huskin and various affiliated limited partnerships, including Horsetooth. As a result of this action, Sanford B. Hertz (Hertz) was appointed as a receiver to manage the affairs of the targeted enterprises. On October 2, the Bank exercised its claimed right of setoff against Horsetooth's checking account. Of the $34,279 balance existing in the account, the Bank used $10,001 to retire the May 9 note, and the remaining $24,278 was employed to reduce the balance on the April 27 note.

This lawsuit followed. Justice contended that the Horsetooth funds constituted a special deposit that was impervious to setoff. Hertz claimed priority to the funds as a receiver. The Bank disputed both claims and argued that the setoff was justified by the maturity of the May 9 note and by the

insolvency of Horsetooth. Major questions for trial to the court were whether a special deposit existed and whether Horsetooth was insolvent. The court found that there was no special deposit and that Horsetooth was not insolvent. It concluded that the Bank was entitled to apply $10,001 from the Horsetooth account to the matured May 9 note. It denied the setoff for the April 27 note, however, indicating that its non-maturity and Horsetooth's solvency prevented a setoff even though no special deposit had been shown.

The court initially awarded the $24,278 to Justice as a Horsetooth creditor, but amended its judgment, awarding the sum to Hertz. The amendment was prompted by the fact that Justice had foreclosed on Horsetooth's assets and had successfully bid the entire amount of indebtedness at the foreclosure sale. The court concluded that after the foreclosure bid Horsetooth owed Justice nothing.

These appeals followed. Justice contends that the finding against a special deposit was erroneous and that the successful foreclosure bidding did not bar recovery. Hertz is satisfied with the special deposit finding, but argues that he is nonetheless entitled to all the monies as the receiver. The Bank also agrees with the special deposit finding, but complains that the court was wrong on the insolvency question. It further asserts a right of full setoff superior to any rights of the receiver.

## II.

In contending that the Bank was not entitled to set off the Horsetooth account, Justice propounds several theories. Its most substantial argument is that the circumstances of this case indicate that the Horsetooth account was a special deposit or deposit for a particular purpose and was therefore unavailable for setoff under Colorado law.

It is settled that a bank takes title to general deposit accounts and that as a creditor it may set off against them. *E. g., Cox v. Metropolitan State Bank, Inc.,* 138

Colo. 576, 336 P.2d 742, 747 (1959); *Mid-City National Bank v. Mar Building Corp.*, 33 Ill.App.3d 1083, 339 N.E.2d 497, 502–03 (1975). This rule does not apply with respect to a special deposit or a deposit for a specific purpose.[2] The bank does not take title. *Miller v. Wells Fargo Bank International Corp.*, 540 F.2d 548, 561 (2d Cir. 1976). Therefore, it cannot set off the account. *E. g., Kaufman v. First National Bank*, 493 F.2d 1070, 1072 (5th Cir. 1974). A deposit is presumed to be general, and a party claiming the existence of a special deposit has the burden of proving it. *See, e. g., First National Bank v. Julian*, 383 F.2d 329, 338 (8th Cir. 1967).

■■ The Colorado rule in this area has been announced as follows:

"Generally, where [a] bank has in its possession assets of [a] debtor, [the] bank may apply these assets to payment of a matured debt or, in case of insolvency of [the] debtor, to an unmatured one, but such right may be controlled by any special agreement which shows a different intent or where circumstances or particular modes of dealing are inconsistent with such right."

*Sherberg v. First Nat. Bank*, 122 Colo. 407, 412, 222 P.2d 782, 785 (1950). A special deposit can, of course, arise from an express agreement between a depositor and the bank. In addition, a trust relationship between the depositor and a third party can support a finding of a special deposit, even though the deposit arrangement has not been formally denominated as such. *Cox v. Metropolitan State Bank*, 138 Colo. 576, 336 P.2d 742 (1959). Beyond these situations, however, it is not certain under Colorado law what circumstances give rise to a special deposit.

The uncertainty stems from language in *Cox v. Metropolitan State Bank*, 138 Colo. 576, 336 P.2d 742 (1959), modifying the earlier decision of *Sherberg v. First Nat. Bank*,

122 Colo. 407, 222 P.2d 782 (1950). Both cases resulted in a finding of special deposit, but each involved a distinct factual situation. Before considering any further the extent to which *Cox* modified *Sherberg*, it will be helpful to examine the rule of law announced in each case.

In *Sherberg*, the plaintiff entered into a home construction contract with Essert, a contractor having an account with the Bank of Englewood. In addition to being a depositor, Essert owed the bank a substantial amount of money. To finance the construction, the plaintiff borrowed $15,000 from the bank and deposited it in Essert's account. The loan negotiations had made the bank fully aware that the deposit was to be used for construction. Furthermore, the bank knew that Essert's financial condition was bleak and was concerned about his ability to discharge his debts to the bank. The bank did not inform the plaintiff of this situation; instead, two days after the deposit had been made, the bank set off Essert's account and applied over $10,000 against Essert's outstanding obligation. In the context of what was obviously regarded as overreaching behavior by the bank, the court announced the following rule:

[W]hen a bank knowingly accepts a deposit for a specific purpose, it cannot thereafter divert the same for its own benefit or otherwise act to defeat the purpose for which the deposit was made.

122 Colo. at 410–11, 222 P.2d at 784.

A different approach to the special deposit issue was taken in *Cox v. Metropolitan State Bank*, 138 Colo. 576, 336 P.2d 742 (1959). In that case, a debtor-depositor named Rust made a substantial deposit in his checking account with the bank. The funds had been received from the sale by Rust of a tractor owned by Cox. Rust had acted as Cox's agent in the transaction and had been expected to turn over the proceeds to his principal. Unaware of the nature of the parties' arrangement, the bank set off

---

**2.** While distinctions may be drawn between these two types of nongeneral accounts, *e. g., Moore Mill & Lumber Co. v. Curry County Bank*, 200 Or. 558, 267 P.2d 202, 206–07 (1954), Colorado cases do not stress the differences.

*E. g., Sherberg v. First Nat. Bank*, 122 Colo. 407, 411, 222 P.2d 782, 784 (1950). For purposes of this opinion, "special deposit" will refer to both types of nongeneral accounts.

Rust's deposit. When suit was brought by Cox, the court found the setoff improper, ruling that the trust relationship between the parties prevented the bank from treating the deposit as a general one.[3]

The *Cox* case introduced uncertainties into Colorado law by announcing an express modification of *Sherberg* to the extent it was inconsistent with the approach taken in *Cox.* 138 Colo. at 587, 336 P.2d at 749. The nature of the modification is important in the present context because Justice places substantial reliance on *Sherberg.* Justice contends that the *Cox* modification relates only to the requirement that the bank have knowledge of the special purpose of a deposit. Reasoning that the bank had knowledge of the deposit's purpose in *Sherberg,* but did not in *Cox,* Justice points to the *Cox* result as modifying only the knowledge requirement implicit in *Sherberg.* Justice thus contends that *Cox* did not limit *Sherberg;* instead, it provided an approach to finding a special deposit where the bank lacks knowledge of the depositor's purpose. In contrast, the Bank argues that *Cox* modified *Sherberg* by imposing in all cases the requirement of a trust relationship for a special deposit—at least when a special deposit is not established by an express agreement.

The trial court was apparently persuaded by the Bank's argument. In reaching its conclusion on this issue, the court said:

> Considering the presumption in favor of general deposits, and the special trust relationship needed in Colorado to form special deposits (at least in the absence of a specific agreement), we are unable to conclude that the deposits in Horsetooth's

account represented special deposits immune from the bank's right of set off. Record, vol. 4, at 161.

Although we believe enough ambiguity exists in this area to permit a contrary construction of Colorado law, we are not convinced that the trial court erred in defining the law as it did. We will give substantial weight to a trial judge's perception of the law of his resident state when the law is unclear. *See Binkley v. Manufacturers Life Insurance Co.,* 471 F.2d 889, 893 (10th Cir.) (Lewis, C. J., concurring), *cert. denied,* 414 U.S. 877, 94 S.Ct. 130, 38 L.Ed.2d 122 (1973). We therefore decline to adopt the interpretation of Colorado law urged by Justice.

However, even if we were to apply the interpretation urged by Justice, we do not believe this would result in a special deposit determination. The court in *Sherberg* was clearly influenced by the overreaching behavior of the bank, a factor simply not present in this case. While the trial court in the instant case did suggest that the Bank had some notice that part of the deposited funds originated from draws on the letter of credit, it also found that no special understanding existed between Horsetooth and the Bank concerning the purpose for which the deposited funds were to be used.[4] Record, vol. 4, at 160. Furthermore, the Bank in this case set off the funds only after a receiver had been appointed and it had reasonably deemed its position to be insecure. This circumstance is distinguishable from that in *Sherberg,* where the bank was apparently waiting for a chance to set off the account, and allowed the plaintiff to fall prey to its scheme. Thus, even under Justice's view of the im-

---

**3.** A different result was reached in *J. B. Ehrsam & Sons Mfg. Co. v. Guaranty Bank & Trust Co.,* 158 Colo. 84, 404 P.2d 844 (1965). In that case the court found no trust relationship—and therefore no special deposit—despite the assistance given the depositor by the creditor in obtaining the funds that the bank ultimately set off.

**4.** Justice contends that even if actual notice of purpose was lacking, "inquiry" notice compelled the Bank to recognize the special nature

of the deposit. However, the advanced funds were deposited in the normal course of business, and funds from other sources were deposited in the same account during the same period of time. Under these circumstances, we would decline to impose on the Bank a duty to determine the depositor's purpose even if we were to adopt the view of *Sherberg* urged by Justice. *See American Surety Co. v. Bank of Italy,* 63 Cal.App. 149, 218 P. 466, 470 (1923).

pact of *Cox, Sherberg* is factually distinguishable from the instant case.

In light of the principles discussed above, we cannot conclude that a special deposit existed. Horsetooth's account was established two years prior to the time the deposits in question were made. No limiting language appeared on the account signature cards, and no express agreement was entered into that gave the account special status. The advances from Justice's agent to Horsetooth were deposited in the account without ceremony. Deposits of other funds from other sources were made in the same account during the same period. It simply does not appear that the parties came to an agreement that the advanced funds were to be isolated in deposit for a special purpose.

Neither does the record indicate error in the trial court's conclusion that no trust relationship existed between Justice and Horsetooth. It is clear that the parties' overall relationship was of a debtor-creditor nature. As to the particular transactions involving the letter of credit, it is also clear that the funds advanced by Justice were not received by Horsetooth as a trustee. Upon receipt, the funds were Horsetooth's; they were not to be held for the benefit of Justice. Even though the contemplated use of the funds probably would have had the effect of enhancing Justice's security, this effect does not establish a *Cox*-like trust relationship as a matter of law.

Several additional contentions are made by Justice to support its claimed entitlement to the deposited funds. They are unconvincing. The equitable foundation for Justice's alternative assertions of resulting and constructive trusts is lacking. The contention that the deposited funds constituted a hereditament is creative, but it is without merit.

### III.

Although the trial court concluded that Horsetooth's account was not a special de-

posit, it denied the Bank a complete setoff. Reasoning that the April 27 note had not matured and that Horsetooth had not become insolvent by the time of the setoff, the court allowed the Bank to retain only $10,001 to satisfy the May 9 obligation. The Bank contends that the trial court applied the wrong test for insolvency.

The trial court conceded that Horsetooth was insolvent under the "balance sheet" test. If this test had been applied, the Bank would have been justified in setting off Horsetooth's account in favor of the unmatured April 27 note.[5] But the court ruled against the Bank after applying an insolvency definition that considers whether a debtor is able to meet his obligations as they come due.

In *Walton v. First National Bank,* 13 Colo. 265, 22 P. 440 (1889), the Supreme Court of Colorado adopted the same insolvency test applied by the trial court in the instant case. While admitting that it "is extremely difficult, if not impracticable, to give a definition of insolvency that shall be applicable to all classes of persons," the *Walton* court offered this definition:

> By insolvency is meant an inability to fulfill one's obligations according to his undertaking, and general inability to answer in court for all of one's liabilities existing and capable of being enforced; not an absolute inability to pay at some future time, . . . but as not being in condition to pay one's debts in the ordinary course, as persons carrying on a trade usually do.

13 Colo. at 272, 22 P. at 442. *Accord, Rising v. Hoffman,* 116 Colo. 63, 179 P.2d 430, 432 (1947).

■ Given this Colorado precedent, we cannot say that the trial court erred in applying the challenged insolvency test. While the balance sheet test reflects the general meaning of "insolvency," the term

---

5. Colorado case law instructs us that a bank may properly apply funds in a debtor-depositor's account to a mature promissory note. If the note is not mature, a bank may still set off the account if the debtor-depositor is insolvent.

*Sherberg v. First Nat. Bank,* 122 Colo. 407, 412, 222 P.2d 782, 785 (1950). Unlike the May 9 note, the April 27 note lacked an acceleration clause.

is also used to indicate "the inability of one to pay his debts as they become due in the ordinary course of his business." 42 Am. Jur.2d *Insolvency* § 1 (1969). The application of a test reflective of this latter usage and expressly approved by Colorado's highest court certainly cannot be considered error.[6]

The Bank also argues that Horsetooth was insolvent under the very test the court applied. To establish its point, the Bank has recited a litany of facts indicating the poor financial position of both Horsetooth and its general partner. While it is quite apparent that Horsetooth was insolvent under the balance sheet approach, we are unwilling to upset the court's determination under the test it applied. We refer to the court's reasoning on this point:

> Using [the above-discussed *Walton*] definition, it cannot be said that Horsetooth was insolvent on October 2, 1973 when the set off occurred. We have seen no evidence to indicate that Horsetooth, prior to the October 2 set off, was unable to pay its debts as they became due or, in fact, had missed any such payments. Given the negative net assets of Horsetooth on October 2 and the state court's findings that Huskin & Company used limited partnership funds interchangeably, it might be speculated that Horsetooth could not meet its debts as they became due. This, however, is speculation and conjecture only.

Record, vol. 4, at 164. Our review of the record indicates that *no* showing was made that Horsetooth was unable to meet its obligations as they became due. We cannot retry the question. We therefore decline to upset the trial court's conclusion.

## IV.

A further issue on appeal is the relative priority, as between the Bank and Hertz, to the Horsetooth account. Hertz contends that his appointment as receiver prior to the setoff entitles him to the funds set off. The Bank argues otherwise. Inasmuch as we have determined that the Bank was not entitled to set off funds against the April 27 note, the dispute must focus on the $10,-001 applied to the May 9 note.

■ Cases dealing with priority disputes between receivers and banks typically arise in insolvency proceedings—insolvency giving rise to the appointment of a receiver. Most of the cases in this area have allowed the bank to retain the funds set off. Annot. 37 A.L.R.2d 850, 854 (1954). The reasoning of the cases is that insolvency makes due the obligation to the bank and furnishes a sufficient ground for setoff.[7] *E. g., United States v. Bank of Shelby,* 68 F.2d 538, 539 (5th Cir. 1934); 10 Am.Jur.2d *Banks* § 670 (1963). Implicit in this rationale is the notion that the receiver stands in no better position than the debtor with regard to the latter's assets.[8] A minority of cases award priority to the receiver, typically reasoning that unfairness to other unsecured creditors would otherwise result. *E. g., Petition of Leon Keyser, Inc.,* 98 N.H. 198, 96 A.2d 551, 553 (1953). Colorado cases have not reflected an express choice between the majority and the minority positions, but we believe the Colorado Supreme Court would apply the majority rule. Language from the *Sherberg* opinion authorizes banks to apply deposited funds to obligations which are not mature upon a debtor-depositor's insolvency.[9] 122 Colo. at 412,

---

6. The trial court itself noted: "[T]o find that negative net assets, alone, is equivalent to insolvency would be to reject the Colorado definition in favor of the bankruptcy balance sheet test." Record, vol. 4, at 164.

7. This is generally true even if the receiver is appointed prior to the setoff. *See* Annot. 37 A.L.R.2d 850, 858 (1954). There is contrary authority. *Id.* at 857.

8. This is, of course, the general rule regarding receivers. *E. g., Green v. Vanston Bondholders Protective Committee (In re American Fuel & Power Co.),* 151 F.2d 470, 481 (6th Cir. 1945), *aff'd,* 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946); *Cates v. Musgrove Petroleum Corp.,* 190 Kan. 609, 376 P.2d 819, 821 (1962).

9. It is clear that *Cox v. Metropolitan State Bank,* 138 Colo. 576, 336 P.2d 742 (1959), did not affect this aspect of *Sherberg.*

222 P.2d at 785. If the minority rule were employed, the *Sherberg* language would become hollow whenever a receiver is appointed in the insolvency context. We will not effect such a result in the absence of Colorado authority indicating any inclination toward the minority viewpoint.

We recognize that the circumstances of this case are distinguishable from cases reflecting either the majority or minority approach. The receiver in this case was not appointed because of bankruptcy or insolvency but because Colorado securities laws had been violated. However, we do not believe this distinction should cause us to award the disputed funds to the receiver. Indeed, the distinction seems to make an even stronger case for the Bank. Inasmuch as the May 9 note became mature because appointment of a receiver activated the note's acceleration provision, there is no need to repeat the initial step taken by majority view cases of finding the obligation mature by reason of insolvency. Instead, this Court need only conclude—as we do—that the receiver had no more control over Horsetooth's assets than did Horsetooth itself.[10] Horsetooth, of course, did not have title to the funds on general deposit with the Bank. Since the Bank was entitled to apply the deposit to the May 9 note against Horsetooth itself, it was also entitled to do so against Hertz.

Hertz also contends that waiver and estoppel principles should prevent the Bank from retaining the funds applied to the May 9 note. We find these contentions unconvincing. The Bank is entitled to the $10,001 applied against Horsetooth's May 9 obligation.

## V.

Although none of the parties is entirely satisfied with the result reached by the trial court in this case, we are convinced that the court's resolution was legally sound. We therefore affirm.

---

**10.** The view of the trial court was that a receiver appointed subject to securities laws is more limited in power, with regard to creditors' claims, than is a receiver appointed in insolvency. Reasoning that a securities law receiver is appointed to protect investors rather than creditors, the court concluded that Hertz' role was more of a business caretaker than an asset aggregator. In any event, the court rightly concluded "that the receiver stands in no better shoes than Horsetooth itself." Record, vol. 4, at 165.