485 So.2d 319 (1986)
RAINSVILLE BANK
v.
John WILLINGHAM and Joan Willingham.
83-913.
Supreme Court of Alabama.
January 10, 1986.
Rehearing Denied March 7, 1986.
*320 William D. Scruggs, Jr. and Michael L. Brownfield, Fort Payne, for appellant.
John Baker, Montgomery, for appellees.
ALMON, Justice.
This is an action for conversion and fraud. The jury awarded $125,000 to the plaintiffs. The trial court granted a remittitur of $25,000. The source of the controversy is an attachment by the defendant bank of funds deposited by one of the plaintiffs.
In January of 1981 John and Joan Willingham filed a petition in bankruptcy under Chapter 13 of Title 11, U.S.C. Among their creditors was the Rainsville Bank, which held two notes they had executed, one for $63,064.08, secured by a second mortgage on their home, and the other for $6,448.32, for which the bank held a security interest in a refrigerated trailer. John Willingham was a truck driver and used this trailer in his business. The Willinghams also had a checking account with the bank.
In early 1982, Mr. Willingham's tractor and trailer were stolen. His insurance company offered either to replace the tractor and trailer or issue him a check. He discussed with Billy Poe, the bank officer with whom he customarily did business, which he should do. Willingham testified:
"I said, `I can have the insurance company replace my truck and trailer,' and I said, `I can go on paying through the [Bankruptcy] Court or I can get dismissed out of Court and try to take what little equity I've got and pay off my small bills,' and I said, `That way I won't owe nobody but y'all and Fyffe Bank and that's it.' I said, `If y'all will work with me, I think I can handle it.' I had paid a right smart, you know, and he suggested that he thought that would be the thing to do.
"Q. That what would be the thing to do?
"A. Pay off the small debts and get dismissed out of Court."
Willingham testified that he told Poe during this conversation that he had been dismissed from bankruptcy court.
*321 The bankruptcy records lend support to Willingham's understanding that the case had been dismissed. On January 19, 1982, the standing trustee had filed a "motion to dismiss debtor's petition" on the grounds that the Willinghams were in default in making payments. The order confirming their Chapter 13 plan called for them to make biweekly payments, and they had not paid since December 16. The court scheduled a hearing on this motion for February 10, but continued it on that date because Willingham was in California working. On February 12, the trucking company which paid Willingham sent a check to the trustee. On February 26 the court sent the company an order to deduct wages and send them to the trustee.
On March 10, at the rescheduled hearing, the trustee informed the court that she had heard that Willingham's truck had been stolen and that he might receive some insurance money. The trustee also informed the court that Willingham's new employer had made payments on January 26 and February 16. The case was continued to April 21. The record of this hearing includes, under "Orders of Court," an "X" beside the line reading "Case Dismissed." The judge did not sign or initial this sheet. On April 22, the trustee filed a final report. On April 26, the court issued an order releasing the trucking company from the wage order. The court did not issue a written order of dismissal until July 22.
On the basis of his discussions with Poe, Willingham obtained a check for $11,500 from his insurance company and took it to the Rainsville Bank on May 5, 1982. Poe was not there at the time, so Willingham talked to Marvin Barron II, vice president of the bank. He told Barron that he wanted to pay off the mortgage on the trailer. The balance due on the note appears to have been $5,592.53. He testified about his conversation with Barron:
"I told him I wanted to pay the mortgage off on the trailer that I had, and he said, `Okay,' and he went and got the note and came back and he saidI had a co-signor on the trailer with me, and he asked meDuring all this, while I was in Court, they had called and sorta persuaded these boys to make payments on that trailer, and he asked me about taking their money out of the check, and I said, `No, I'll take care of them. I'll pay them myself.'
"Q. When you told him that you wanted to pay off the trailer, did you show him the check or did he know how you were going to pay it off?
"A. I told him I had the check.
"Q. Was he familiar with the transaction? Did he know what check you were talking about?
"A. I'm sure he did. I told him I had it on my trailer, insurance check.
"Q. Okay. All right, then, what happened or what was said?
"A. Well, he marked my note paid and handed it to me, and he wanted to know what I was going to do with the other money, and I told him, `I'm going to pay my small bills I've got around.' He said, `What are you going to do with it today?' I said, `I'm going to deposit it,' and that was the length of our conversation."
Willingham deposited $5,907.47 in the Willinghams' joint checking account. He went directly to the businesses of several of his creditors and wrote checks for the amounts he owed them.
Barron testified that after Willingham left the bank, he (Barron) telephoned the bank's attorney regarding Willingham's status in bankruptcy. Barron said the attorney
"advised me that not only did I not have a right to my portion of the insurance check for the note, he did not have a right to what was left over because he was still in bankruptcy and any disposal of any assets [would] have to go through the trustee.... I placed a hold on the account because [the attorney] further advised me that whoever disposed of those funds would be liable in their entirety."
The record is not clear as to whether Willingham told Barron that he had been dismissed *322 from bankruptcy. Barron testified that he inquired of the attorney because he had not seen any orders from the bankruptcy court dismissing the Willinghams' action. On the same day he mailed a letter informing Mr. Willingham of the hold.
Because of the hold, the bank refused to honor the checks that Willingham wrote immediately after leaving the bank. Willingham's attorney in bankruptcy wrote a letter requesting return of the funds, but the bank refused.
On May 19 the bankruptcy court held a hearing at which the bank's attorney and the trustee were present. The bank's attorney informed the court that the Willinghams' attorney had requested a continuance. The court asked the bank's attorney if he knew any reason why the case could not be dismissed. The attorney answered:
"... Mr. Willingham stated to the bank he has been dismissed. And as we alleged in our motion, there was a portion of a vehicle stolen, and there are some funds available that have been paid to the Rainsville Bank that we're holding pending the dismissal of the case or whatever the Court determines of the case.
"THE COURT: Why can't the Court just dismiss the case, let the bank do whatever they
"MR. TRAYLOR: That's what we would prefer to do, but I did not want to do it without my notifying the Court what was available
"THE COURT: I don't think that would change the picture.
"MR. TRAYLOR: I would hope it would not.
"THE COURT: How much money
"MR. TRAYLOR: $11,500. The debt for which that security was given was around $3,900, leaving a surplus of about, whatever the difference is, to be applied to the bank home free to any debt he still owed the bank, which is around $30,000.
"THE COURT: I'm not going to change this order of dismissal.... I'm going to dismiss this adversary proceeding in connection with it as being moot."
The adversary proceeding to which the court referred was one that the bank had filed in order to proceed against Willingham's co-signers on the two notes.
The exhibits submitted to the jury included the transcript of this hearing. It is evident that, at least within two weeks after accepting the deposit, the bank proposed to use it as a setoff against the mortgage debt and not to allow the Willinghams to use it to pay off their other small debts, as Willingham told Barron and Poe he intended to do. Furthermore, this transcript shows that the bank presented this position to the court when the Willinghams' attorney was not present and had requested a continuance. Thus, the Willinghams' attorney was not present to point out that Willingham had presented the check and the bank had accepted it with the understanding that he would use the excess over the amount due on the trailer note to pay his smaller debts.
In spite of Willingham's continuing efforts to obtain the portion of the insurance check which had been credited to the checking account, the bank continued to hold the money. On June 4, 1982, Willingham filed this suit. Shortly thereafter, Truman Hicks, who was a member of the board of directors and the loan committee of the bank, and whom Willingham considered a friend, talked to Willingham. Willingham testified:
"He said that he wouldif I would drop the lawsuit he would help me pick up the checks and get me another truck, and he said if I didn't hand over the money that the bank was holdingHe saidDr. Barron [Dr. Marvin Barron I, president of the bank] he called Doc. He said, `Doc's gonna sell your house.'"
In July the bank sent the Willinghams notice of foreclosure of the mortgage on their home. On July 22, the bankruptcy court issued its final order of dismissal. On July 31 the bank applied the balance of the Willinghams' checking account to the balance due on the note secured by the *323 mortgage on their home. In August, the bank foreclosed the mortgage and purchased the Willinghams' house for $33,386.02 at the foreclosure sale.
The Willinghams' original complaint sought damages for conversion. By amendment, they added a fraud count alleging suppression of material facts and deceit. The case went to trial on these two counts and on the bank's counterclaim for the amount of the mortgage note not satisfied at the foreclosure sale, $11,308.34, plus interest and attorney's fees. The bank's answer included affirmative defenses that Willingham himself was guilty of fraud, suppression of facts, or deceit in telling the bank that he had been dismissed from bankruptcy; that the bank was entitled to the money under its contractual right of setoff in the mortgage note; and that the bank acted in reliance on advice of counsel.
The jury returned a verdict for $125,000 in favor of the Willinghams. The bank moved for JNOV or, in the alternative, new trial. The court issued an order ruling that the evidence supported the jury's verdict finding in favor of the Willinghams on the issues, but that the damages were excessive, and stating that the court would grant the motion for new trial unless the Willinghams filed a remittitur of damages in excess of $100,000. The Willinghams filed a remittitur, whereupon the court entered a final judgment. The bank filed notice of appeal.
The bank raises the following issues: (1) Whether the trial court erred in denying the post-trial motions because the jury's finding for the Willinghams on the conversion claim was contrary to the evidence and the applicable law; (2) Whether the trial court erred in denying the post-trial motions because the jury's finding of suppression of fact and deceit was contrary to the evidence and the applicable law; (3) Whether the trial court erred in denying the bank's motion for directed verdict; (4) Whether the jury properly awarded punitive damages; (5) Whether the jury improperly returned a verdict for the Willinghams on the counterclaim; and (6) Whether the trial court erred in failing to charge the jury that the Willinghams could not recover if the alleged conversion was the result of the misstatement by Willingham.
The bank's argument for setoff is as follows: A bank customer's deposit in a banking account becomes a debt from the bank to the customer. When the bank also lends money to the depositor, mutual debts exist, and the bank may, when the loan matures, apply the money it owes the depositor towards the depositor's debt to the bank. King v. Porter, 230 Ala. 112, 160 So. 101 (1935).
This rule is limited by the exception that where the customer has made the deposit for a special purpose, known to the bank, the bank may not set the deposit off against the loan. First City National Bank of Oxford v. Long-Lewis Hardware Co., 363 So.2d 770 (Ala.1978); Kaufman v. First National Bank of Opp, Alabama, 493 F.2d 1070 (5th Cir.1974). This exception applies in the instant case. Not only did Poe advise Willingham that his best course of action would be to use the excess of the insurance proceeds to pay off his smaller debts, but also Willingham informed Barron of this purpose at the time he made the deposit.
The bank responds that "paying bills" cannot be a special purpose for a checking account deposit, because most such deposits are used for this purpose. This argument fails here for two reasons: Barron specifically asked Willingham what he intended to use the rest of the money for, and the bank's advice to use the money to pay off the bankruptcy debts precludes it from successfully arguing that the payment of these debts is not a special purpose. Although Willingham was not specific as to which debts he intended to pay, Poe's and Barron's familiarity with his bankruptcy was sufficient to put the bank on notice that the funds were to be used for a special purpose.
For these reasons, the deposit was a special deposit and the bank had no right of setoff with regard to these funds. It received *324 the amount for the special purpose of allowing the Willinghams to pay certain of their debts. When the bank seized the funds and prevented their intended use, it became liable for conversion. It is no defense for the bank to argue that it could not have paid out the funds because of the bankruptcy stay. The bank's proper response if it were making a bona fide assertion of the bankruptcy stay was either to inform Willingham before accepting the funds that it could not honor checks on the account until it had a final order of dismissal from the bankruptcy court or to turn the funds over to the bankruptcy trustee as soon as it realized that the Willinghams had not in fact been dismissed.
The evidence shows that the bank accepted the deposit knowing Willingham would pay some of the smaller debts in order to be dismissed from bankruptcy and yet immediately thereafter asserted the inconsistent position that it would hold the funds because the Willinghams had not been dismissed. Moreover, Willingham's testimony indicates that Poe advised him that if he took this course the bank would cooperate with him in allowing him to pay off the mortgage debt. Willingham deposited the check in reliance upon this advice, but the bank converted the funds to its own use and then foreclosed the mortgage.
The evidence also supports a finding of fraud. The jury could infer from Barron's actions in accepting the deposit that he intended to hold it at the time he accepted it, and he certainly did not inform Willingham of any such intention. Barron's version was that he did not think to inquire of the attorney about Willingham's status until Willingham left, but the jury could have disbelieved this, especially in view of how quickly he made the call after Willingham left and in view of his presumed familiarity with bankruptcy procedures as vice president of a bank.
The bank argues that the jury's verdict should have included an award to the bank on its counterclaim because the evidence clearly supported its counterclaim for the balance due on the mortgage note and the expenses for collection. During the jury's deliberations, however, the jury sent a written question to the court which asked, "If the jury finds the issue in favor of the plaintiffs and against the defendant, will Mr. Willingham still owe the $11,308.34 to the Rainsville Bank?" The amount quoted is the amount claimed in the counterclaim. The record reveals that counsel for the bank "agree[d] that the court can respond by writing the word `No' and sending it back to the jury." By this agreement, the bank consented to the form of verdict which it now attacks. This argument presents no grounds for reversal.
The bank argues that the trial court erred in failing to give an instruction that the Willinghams could not recover for conversion if the conversion was the result of Willingham's own misstatement that he had been dismissed from bankruptcy. We find no error because we find no misstatement. Willingham made no statement that he had received a final dismissal, but in fact stated that he would use the money to pay off his small debts and be dismissed. The bankruptcy records show that the court had indicated a dismissal of the case at a hearing only a few days prior to his conversation with Poe. The trial court did not err in refusing this instruction.
Finally, the bank argues that the jury erred in awarding punitive damages. Punitive damages may be awarded in conversion actions "where the evidence shows legal malice, willfulness, insult, or other aggravating circumstances." Ray Hughes Chevrolet, Inc. v. Gordon, 294 Ala. 638, 639, 320 So.2d 652, 654 (1975); Russell-Vaughn Ford, Inc. v. Rouse, 281 Ala. 567, 206 So.2d 371 (1968); Roan v. Smith, 272 Ala. 538, 133 So.2d 224 (1961). Juries may similarly award punitive damages in fraud actions. Old Southern Life Ins. Co. v. Woodall, 348 So.2d 1377 (Ala.1977). The jury could have found from the evidence in this case that the bank acted willfully or maliciously. Under either cause of action, therefore, the award of punitive damages is sustainable.
*325 The Willinghams challenge the trial court's order conditioning the denial of the bank's new trial motion on a remittitur of the amount of the verdict in excess of $100,000. The trial court did not specify any reasons why it deemed the verdict excessive. Although the dissent in General Motors Corp. v. Edwards, 482 So.2d 1176 (Ala.1985), expressed the view that remittitur should not be granted without a statement of reasons, the majority of the Court held that it is not an abuse of discretion for a court to award remittitur without stating its reasons. Nothing in this record presents a clear abuse of discretion, so the award of remittitur is not due to be reversed.
The judgment of the trial court is affirmed.
AFFIRMED.
FAULKNER, JONES, SHORES, BEATTY and ADAMS, JJ., concur.
TORBERT, C.J., and MADDOX and HOUSTON, JJ., concur specially.
TORBERT, Chief Justice (concurring specially).
While I agree that the evidence in this case could be sufficient to establish actionable fraud, I disagree with the majority's characterization of the funds as a "special deposit." A special deposit exists only when funds are placed in an account for a specific and particular purpose, or to be paid to a particular person. First City National Bank of Oxford v. Long-Lewis Hardware Co., 363 So.2d 770, 772 (Ala. 1978); First National Bank of Decatur v. Henry, 159 Ala. 367, 375, 49 So. 97,100 (1906). There must be either a specific direction or agreement between the depositor and the bank that it be a special deposit, or circumstances sufficient to create a trust by operation of law. Kaufman v. First National Bank of Opp, 493 F.2d 1070, 1072 (5th Cir.1974). Otherwise, a deposit will be deemed a general deposit, subject to a legal setoff by the bank. A deposit is presumed to be general, and a party claiming the existence of a special deposit has the burden of proving it. Glenn Justice Mortgage Co. v. First National Bank of Fort Collins, 592 F.2d 567, 570 (10th Cir.1979); First National Bank of Clinton v. Julian, 383 F.2d 329, 338 (8th Cir.1967).
In this case, the only relevant statement by Mr. Willingham was that he was going to pay off his small debts. There is no evidence that Willingham provided the bank with a list of the small debts to be paid, or even any instructions as to how to determine what his small debts were. In fact, Willingham actually wrote checks for three new purchases after the deposit. Furthermore, the deposit did not differ from any previous deposits made by Willingham during the history of the account.
I do not believe that a single statement made by Willingham to an officer of the bank as to his intention "to pay my small bills I've got around" creates a specific direction or agreement to apply the funds only to a specific and particular purpose. Likewise, mere notice by two bank officials as to what a customer intends to use his money for should not be sufficient to create a special deposit. I believe that more evidence of an understanding between the depositor and the bank must be present before a deposit can become a special deposit. It simply does not appear to me that the parties in this case came to any agreement that the advanced funds were to be isolated in deposit for a specific purpose.
For the foregoing reason, I disagree with that part of the opinion which characterizes Willingham's deposit as a special deposit.
MADDOX and HOUSTON, JJ., concur.